**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 3, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOAN WALL,

      Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security,[*]

      Defendant-Appellee.

No. 06-1029

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 05-CV-526-MSK)**

---

Submitted on the briefs:[**]

Frederick W. Newall, Colorado Springs, Colorado, for Plaintiff-Appellant.

William J. Leone, United States Attorney, Kurt J. Bohn, Assistant United States Attorney, and Thomas H. Kraus, Special Assistant United States Attorney, Denver Colorado, for Defendant-Appellee.

---

Before **HARTZ**, **HOLLOWAY**, and **BALDOCK**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Michael J. Astrue is substituted for Jo Anne B. Barnhardt as appellee in this action.

[**] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Claimant Joan Wall was born in February 1942. She most recently worked as a telemarketer for MCI from October 1997 to April 1998, and as a customer service representative for Telequest from April 1998 to October 1999. See Aplt. Admin. App. (hereinafter App.) at 111. Claimant suffered injury in August 1995 when a Cadillac struck the rear end of the vehicle she was driving. See id. at 471. In addition, Claimant was injured in an August 1999 fall at work in a flooded restroom. See id. at 330. The parties do not dispute that Claimant has neither sought nor engaged in substantial work since late 1999.

Claimant filed an application for supplemental social security benefits based on disability in October 2001. In February 2002, the Social Security Administration initially denied her claim, concluding that even if Claimant was precluded from performing her past relevant work, she could still perform other work in the national economy. See id. at 84. Claimant subsequently received a hearing before an ALJ in May 2003. In October of that year, the ALJ concluded Claimant was not disabled under the meaning of the Social Security Act (SSA). In January 2005, the Appeals Council denied Claimant's request for review. Accordingly, the ALJ's decision stands as the Social Security Administration's final decision for purposes of appeal. See Blea v. Barnhart, 466 F.3d 903, 908 (10th Cir. 2006). Claimant challenged the agency's decision in the United States District Court for the District of Colorado. The district court – after what was obviously a thorough review of the record –

determined that substantial evidence supported the ALJ's decision and affirmed the agency's ruling in December 2005. Claimant then instituted this appeal.

The Social Security Administration uses a five-step framework to determine whether a claimant is disabled under the SSA. See 20 C.F.R. § 416.920; see also Allen v. Barnhart, 357 F.3d 1140, 1142 (10th Cir. 2004). In the present suit, Claimant alleges the ALJ's erred in three principle ways. First, Claimant alleges the ALJ failed to make a proper step three determination because he failed not only to adequately consider her mental impairments, but also to develop the administrative record in this regard. Second, Claimant argues the ALJ incorrectly concluded, at step four, that she is capable of performing her past relevant work as a telemarketer. Third, Claimant suggests the ALJ applied an incorrect standard of proof in weighing the credibility of her testimony. We have jurisdiction under 42 U.S.C. § 405(g) and 28 U.S.C. § 1291. Because we conclude the ALJ (1) had no duty to develop the already extensive record in this case, (2) utilized the proper legal standards, (3) provided a sufficient explanation for his decision, and (4) ultimately made findings supported by substantial record evidence, we affirm.

I.

We begin with a short explanation of the Social Security Administration's disability analysis and our standard of review. Under the Social Security Act, a claimant is disabled if she is unable to do "any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be

expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). The five-step framework the Social Security Administration uses to determine whether these conditions are met proceeds as follows. See 20 C.F.R. § 416.920.

Step one requires the agency to determine whether a claimant is "presently engaged in substantial gainful activity." Allen, 357 F.3d at 1142. If not, the agency proceeds to consider, at step two, whether a claimant has "a medically severe impairment or impairments." Id. An impairment is severe under the applicable regulations if it significantly limits a claimant's physical or mental ability to perform basic work activities. See 20 C.F.R. § 404.1521. At step three, the ALJ considers whether a claimant's medically severe impairments are equivalent to a condition "listed in the appendix of the relevant disability regulation." Allen, 357 F.3d at 1142. If a claimant's impairments are not equivalent to a listed impairment, the ALJ must consider, at step four, whether a claimant's impairments prevent her from performing her past relevant work. See id. Even if a claimant is so impaired, the agency considers, at step five, whether she possesses the sufficient residual functional capability to perform other work in the national economy. See id.

Our review of the district court's ruling in a social security case is de novo. See Fischer-Ross v. Barnhart, 431 F.3d 729, 731 (10th Cir. 2005). Thus, we independently determine whether the ALJ's decision is "free from legal error and supported by substantial evidence." Id.; see also 42 U.S.C. § 405(g) ("The findings

4

of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). Although we will "not reweigh the evidence or retry the case," we "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Flaherty v. Astrue, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations omitted). Our determination of whether the ALJ's ruling is supported by substantial evidence "must be based upon the record taken as a whole." Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994). Consequently, we remain mindful that "[e]vidence is not substantial if it is overwhelmed by other evidence in the record." Grogan v. Barnhart, 399 F.3d 1257, 1261-62 (10th Cir. 2005).

## II.

To demonstrate that the record is sufficiently developed and that the ALJ's findings are supported by substantial evidence, we proceed to summarize the opinions of the staggering array of experts whose findings are reflected in the record on appeal. In this case, the record consists of more than seven hundred pages. The great bulk of these pages document Claimant's extensive medical history.

5

A.

From 1996 to 2000, Dr. Kenneth Finn treated Claimant. During much of this period, Claimant continued to work, although, at times, she complained of terrible pain. See, e.g., App. at 550. As early as 1996, Dr. Finn diagnosed Claimant with a cervical strain, thoracolumbar strain, myofascial pain, sleep disturbance, and tension headaches. See id. at 669. Dr. Finn's last characterization of Claimant's condition, in 2000, indicates that he believed Claimant had a cervical strain with residual chronic myofascial pain and tension headaches. See id. at 539. He indicated that both of these conditions were related to Claimant's C5-6 disk herniation. See id. Dr. Finn also concluded that Claimant had a lumbar strain and left knee strain, with an underlying posterior medial meniscal tear. See id. But he found no evidence of a "neurologic compromise." Id. Absent surgery, Dr. Finn stated that Claimant would reach maximum medical improvement in approximately three to six weeks. See id. at 540.

In December 1997, Dr. Finn placed Claimant on a series of work restrictions. He indicated that Claimant should (1) work in a sedentary work category; (2) not lift more than ten pounds on an occasional basis; (3) be able to alternate her tasks every forty-five to sixty minutes, including sitting, standing, and walking; and (4) not remain in static positions, such as sitting, standing, or driving, for more than forty-five to sixty minutes. See id. at 597. In August 1998, Dr. Finn stated that Claimant could maintain a full work schedule, but he indicated that Claimant's employer

6

should ensure that she had two days off in a row in order to give her sufficient time to recuperate each week. See id. at 566. Sometime before February 1999, Dr. Finn rescinded all of Claimant's work restrictions: "I feel she can continue to work without restrictions." Id. at 551.

In October 1998, Dr. Richard Lazar performed a consult for Dr. Finn in regard to Claimant's neck pain. He described Claimant's mental status as clear and indicated that she was alert and oriented to "person, place, and time." Id. at 466. After noting Claimant's "long history of neck pain," Dr. Lazar stated that Claimant had "decreased cervical spine motion," but his examination showed "no evidence of disk herniation or foraminal encroachment." Id. at 464, 468. He saw no "surgical solution to [Claimant's] neck pain." Id. at 464.

In 1997 and 1998, Claimant saw Dr. Steve Murk in regard to neck pain, as well as numbness in her arms. Dr. Murk found Claimant's mental status to be clear and noted that she guarded her cervical range of motion. See id. at 469. His examination of Claimant's radiographic studies indicated a "very slight flattening of the ventral [spinal] cord" but no "cord compression."[1] Id. Claimant's "small central disc displacement," which was apparently first diagnosed in 1995, had not changed.

---

[1] X-rays taken in 1997 and 1998 showed Claimant had a midline herniation at C4-C5 that caused minimal impression on the ventral spinal cord but no compression. App. at 477, 487. This herniation was possibly "slightly larger" in 1998 than it appeared in 1997. Id. at 478. Nothing in the record indicates that this subtle enlargement had any adverse effects on Claimant's condition. See id. at 477-78.

7

Id. at 470.  Dr. Murk characterized Claimant's condition as chronic myofascial pain syndrome.  See id. at 470, 473.  He believed that surgical intervention would not help Claimant's pain; instead he recommended she undergo physical therapy.  See id. at 470.

B.

Claimant began to see Dr. Kent Roberson after her August 1999 fall.  Dr. Roberson diagnosed Claimant with chronic cervical and lumbar myofascial pain, bilateral degenerative joint disease in her knees, a left knee meniscal tear, and a right knee meniscal tear with degenerative changes.[2]  See id. at 330.  Dr. Roberson agreed with the view of a consulting physician, Dr. Lesnak, that Claimant's problems with her cervix, back, and knees were longstanding.[3]  See id. at 330-31.  In his opinion, the tear Claimant suffered in her left knee was due to her 1999 injury.  See id. at 331.  He gave Claimant's a whole person impairment rating of 10%.  See id.

In February 2001, Dr. Roberson concluded that Claimant was at maximum medical improvement.  See id. at 331.  He stated that Claimant "had no permanent

---

[2]  Myofascial pain describes pain in muscles derived from inflamation of the fascia or connective tissue that covers them.  See Cleveland Clinic, http://www.clevelandclinic.org/health/health-info/docs/3600/3662.asp?index=12054.  "Myofascial pain . . . is a common painful disorder responsible for many pain clinic visits."  See Dr. Jennifer E. Finley, http://www.emedicine.com/PMR/topic84.htm.

[3]  In 1999, Dr. Roberson also referred Claimant to Dr. Tanweer Khan for an assessment of her spine and left knee.  Dr. Kahn found an "anterolisthesis of L4 over L5 measuring approximately 5mm."  App. at 374.  He noted mild to moderate degenerative changes, with a minimal loss of disc space height.  See id. at 374-76.  Dr. Khan did not find any abnormalities in Claimant's left knee.  See id. at 376.

8

restrictions" from her 1999 injury and indicated that she could return to work. Id. at 330, 393. In what appears to be an attempt to defer to Dr. Finn, however, Dr. Roberson erroneously indicated that Claimant should follow the restrictions Dr. Finn had put in place in 1997. See id. at 330. The record demonstrates that Dr. Finn, lifted these restrictions sometime before February 1999. See id. at 551.

In November 1999, Dr. Roberson referred Claimant to Dr. James Evans, a psychologist, to help Claimant deal with her chronic pain. See id. at 497. Dr. Evans treated Claimant over a nine month period, beginning in 1999 and ending in 2000. At the onset of Claimant's treatment, Dr. Evans' records show that Claimant was exhibiting signs of serious depression, including not getting out of bed on some days. See id. 271. Dr Evans also initially questioned whether Claimant had a cognitive disorder. See id. at 269. Over the course of Claimant's treatment, however, Dr. Evans became very optimistic about her condition. See, e.g., id. at 246-48.

Although Dr. Evans recognized that Claimant was depressed and suffered from intractable pain, he most often characterized her psychological condition as reactive depression.[4] See id. at 247-48, 250-54, 256-57. Dr. Evans specifically stated that he did not believe that Claimant suffered from "clinical depression in terms of [her]

---

[4] Reactive depression is generally a transient condition precipitated by a stressful life event or other environmental factor. See Dorland's Medical Dictionary for Healthcare Consumers (2007).

9

depression being debilitating."[5] Id. at 260; see also id. at 255. On the contrary, he believed that Claimant "really is very capable and she does not need to be in a dependent relationship either with her health care providers or with anyone else." Id. at 248. Accordingly, Dr. Evans focused his efforts on transitioning Claimant back into the workforce and a more independent style of living, in which he believed Claimant would function "quite well." Id. at 249; see also id. at 246-47, 249, 251, 255, 262.

Unfortunately, Dr. Evans found that multiple factors hindered Claimant's progress. First, Dr. Evans indicated that Claimant was "somewhat hypochondriacal," evinced "significant somatization," and demonstrated "delayed recovery symptoms." Id. at 251, 257, 263. Second, Dr. Evans felt that Claimant was not controlling the pain she experienced but was allowing the "pain to control her." Id. at 257. Third, he noted Claimant had become somewhat dependent on her healthcare providers and the attention she received from them. See id. at 247, 267. Fourth, Dr. Evans concluded Claimant was "too comfortable being inactive and much too comfortable receiving her lost wages." Id. at 260. He stated that Claimant had an "issue of secondary gain" which made it very difficult to motivate her to return to work. Id.

---

[5] Dr. Evans also noted, on occasion, that Claimant exhibited symptoms of fear and anxiety. His notes indicate that this anxiety concerned the possibility of surgery, the prospect of returning to work, and the winding down of treatment with her medical providers. See, e.g., App. at 246, 247, 248, 250, 253, 263, 264.

In July 2000, David Schlender, a physical therapist, evaluated Claimant's functional capacity over a two-day period. See id. at 502. He noted that Claimant was able to reach, walk up and down stairs, perform fine motor activities, as well as walk and stand in place with occasional shifting. See id. at 503-05. At times, Mr. Schlender stated that Claimant had difficulty understanding simple commands. See id. at 506. He indicated, however, that physically Claimant could maintain a sedentary work level, with frequent breaks throughout the work day, if she was not required to lift more than ten pounds on an occasional basis. See id. at 503-06.

In September 2000, Dr. Roberson referred Claimant to Dr. Audrey Krosnowski for a medical consultation. Dr. Krosnowski concluded that Claimant had (1) a transverse tear in her medial meniscus, (2) mildly to moderately attenuated cartilage in the vicinity of the posterior horn of her medial meniscus, and (3) a mild to moderate size joint effusion. See id. at 299-300. After conducting an MRI of Claimant's lumbar spine, Dr. Krosnowski found a "5 mm grade I L4-5 degenerative anterolisthesis . . . without evidence of gross L4-5 degenerative changes."[6] Id. at 301. Dr. Krosnowski gave Claimant a whole person impairment rating of 14%, the highest impairment rating Claimant received from any physician. See id. at 305.

_____

[6] Anterolisthesis describes the upper vertebral body of the vertebrae slipping forward onto the one below. This slippage is graded on a scale from 1 to 4. Grade 1 is classified as mild slippage, while grade 4 is classified as severe slippage. See Cedars-Sinai Medical Center, http://csmc.edu/5727.html. Dr. Krosnowski's September 2000 diagnosis of Claimant's spinal condition is identical to that made by Dr. Khan in October 1999. See App. at 374.

11

In October 2000, Dr. Roberson referred Claimant to Dr. John Pak in regard to her knee pain. See id. at 321. Because Claimant's complaints were inconsistent, Dr. Pak ordered an MRI of her left knee. See id. at 320. He diagnosed Claimant with a "mild effusion only of the right knee and no effusion of the left." Id. at 316. Although Claimant did not respond to a cortisone injection in her right knee, Dr. Pak stated that she was "at maximum medical improvement and she should have impairment based upon range of motion deficit as well as the meniscus tear." Id. Dr. Pak did not specify what he believed Claimant's percentage of impairment to be. See id.

In December 2000, Dr. Lawrence Lesnak, yet another physician, conducted a physical examination of Claimant, reviewed Claimant's medical records, and prepared an independent medical evaluation of her condition. Dr. Lesnak prepared an extensive summary of Claimant's medical records, dating from 1988 to 2000. See id. at 175-80. In his review of Claimant's medical history, Dr. Lesnak noted that Claimant had been treated for pain in her back and neck as early as 1990. See id. at 176.

Around this time, Dr. Joseph Mitchell, a psychologist, also evaluated Claimant. See id. Dr. Mitchell diagnosed Claimant with an adjustment disorder.[7]

_____

[7] An adjustment disorder is a nonpsychotic disturbance that is short-term and related to stress. Persons classified with an adjustment disorder are judged to be disproportionately overwhelmed, or overly intense, in their response to an

(continued...)

12

See id. He suggested that psychological factors were affecting Claimant's physical symptoms and recommended Claimant undergo psychotherapy focused on pain management.[8] See id. In 1997, Dr. Glenn Kaplan, another psychologist, evaluated Claimant. Dr. Kaplan found that Claimant had reached maximum medical improvement in regard to her "psychological abnormalities, which included depression." Id. at 177.

Dr. Lesnak's report also indicated that Claimant complained of headaches, related to problems with her neck, as early as 1995. See id. at 176. In 1997, Claimant visited Dr. Kenneth Raper in regard to pain in her knees, which began to bother Claimant after her 1995 car accident. See id. at 431. Dr. Raper diagnosed Claimant with degenerative joint disease. See id. at 176. Around this same time, Claimant also saw Dr. E.J. Ausman for left hand and arm numbness. See id. Dr. Ausman diagnosed Claimant with a thoracic strain with secondary radiculopathy.[9]

---

[7](...continued)
identifiable stressor. See Dr. Tami D. Benton, http://www.emedicine.com/med/topic 3348.htm.

[8] Dr. Roberson referred Claimant to Dr. Evans, a psychologist, for this same purpose in 1999. See App. at 497.

[9] A thoracic strain refers to a soft tissue injury in the region of the thoracic spine, which causes acute or subacute pain in the back. Patients with a thoracic strain have muscle spasms and a limited range of motion. See Dr. Darren Rosenberg, http://www.mdconsult.com/das/book/body/87764725-2/0/1189/46.html. "Radiculopathy" refers to damage caused to a nerve root by an injury to the spinal cord. See University of Wisconsin-Madison Neuroscience Resource Page, http://www.neuroanatomy.wisc.edu/SClinic/Radiculo/Radiculopathy.htm.

See id.

In his objective findings, Dr. Lesnak indicated that Claimant was cooperative during on oral interview but needed to be redirected when answering multiple questions, as she engaged in some tangential speech. See id. 180. In regard to his physical examination of Claimant, Dr. Lesnak noted that she declined to perform certain tests, as Claimant was "unwilling to perform any activity that she feels may cause her discomfort." Id. at 181. Dr. Lesnak noticed that Claimant exhibited significant guarding when he examined her knees and that her range of motion greatly increased when she was distracted. See id. During muscle testing, Dr. Lesnak recorded that Claimant "gave poor effort." Id. at 182. He also indicated that Claimant "exhibited multiple pain behaviors and nonphysiologic findings, including 4/5 positive Waddell signs."[10] Id.

Dr. Lesnak's December 2000 evaluation concluded that Claimant had chronic pain symptoms in her neck, trapezius muscle, arms, lower back, and knees, which were longstanding in nature. See id. at 183-84. Dr. Lesnak believed that Claimant's impairments were fully existent before 1999, although Claimant's fall at work that year may have aggravated them.[11] See id. at 184. In his opinion, Claimant had been

_____

[10] Waddell signs are indications that a patient has nonorganic pain. They are used to identify patients who may require detailed psychological assessment. Three or more Waddell signs are deemed clinically significant. See Dr. Scott Vogelgesang, http://www.int-med.uiowa.edu/Divisions/Rheumatology/LowBackPain.html.

[11] For example, Dr. Lesnak noted that Claimant had been "referred to physical
(continued...)

14

"very dependant on her healthcare providers over the past decade" and had "chronic pain . . . documented for most, if not all, of that time." See id. Consequently, Dr. Lesnak opined that Claimant had reached maximum medical improvement and that the level of pain she was experiencing was "essentially her baseline." Id. He questioned Claimant's credibility based on certain statements Claimant made, which conflicted with information in her medical records. See id. at 185-86. Dr. Lesnak stated that he did not believe that Claimant required "any permanent work restrictions whatsoever." Id. at 185.

In March 2001, Dr. Robert Kawasaki examined Claimant and her medical records, and prepared an independent medical evaluation of her condition. Dr. Kawasaki noted that Claimant was very guarded when he tested her cervical range of motion and examined her lumbar spine. See id. at 188. He also concluded that Claimant showed poor effort during muscle testing and that she "complain[ed] of pain with all maneuvers." Id. at 188-89.

Dr. Kawasaki's list of impressions/diagnoses shows that he felt Claimant had a history of chronic pain in her back, trapezium muscle, and cervix, as well as chronic migraine headaches, hypertension, and diabetes mellitus.[12] See id. at 194.

_____

[11](...continued)
therapy for chronic cervical myofascial pains . . . approximately one month prior to her August 10, 1999, reported work injury." App. at 185.

[12] Dr. Kawasaki's summary of Claimant's medical history does not support his impression/diagnoses that she suffered from chronic migraine headaches. See

(continued...)

15

Dr. Kawasaki agreed with Drs. Lesnak and Roberson that Claimant's cervical, thoracic, back, shoulder, arm pain and psychological issues were longstanding in nature. See id. at 195. Dr. Kawasaki, however, attributed Claimant's left medial meniscal tear and oblique horizontal tear of the posterior horn of the right medial meniscus to her 1999 fall at work.[13] See id. He indicated that these injuries gave Claimant a "14% whole person impairment." Id.

In November 2001, Dr. Steven Stockdale, a psychologist, performed a few mental tests on Claimant, reviewed one page of Dr. Kawasaki's report, and prepared an evaluation of Claimant's mental abilities. See id. at 236. Although Dr. Stockdale was aware that Claimant had recently been treated by another psychologist, Dr. Evans, none of Dr. Evans' records were made available for his review. See id. During the course of Dr. Stockdale's examination, Claimant said that she had problems organizing, finding words, and losing things. See id. at 237. She rated herself as having mild to moderate problems with headaches, disorientation, slow thinking, patience, anger, apathy, and short-term memory loss. See id. Claimant also reported that she normally used glasses to read but she did not bring them to her

---

[12](...continued)
App. at 189-94. In fact, Dr. Kawasaki seems to be the only physician of record to suggest Claimant suffered from migraines.

[13] "One of the most commonly injured parts of the knee, the meniscus, is a wedge-like rubbery cushion located where the major bones of the leg connect." American Academy of Orthopedic Surgeons, http://orthoinfo.aaos.org/topic.cfm? topic=A00358.

appointment with Dr. Stockdale. See id. at 238.

Claimant's score for verbal and performance intelligence was borderline. See id. Her full scale intelligence score was in the mentally deficient range. See id. In terms of memory, Claimant's scores ranged widely from the mentally deficient range to high average. See id. at 239. Based on the limited information he had available, Dr. Stockdale could not determine whether Claimant's apparent cognitive difficulties were organic. See id.

Dr. Stockdale diagnosed Claimant with a cognitive disorder NOS, etiology unknown, as well as a pain disorder with psychological factors, and symptoms consistent with major depression and anxiety disorder.[14] See id. Noting that some of Claimant's scores were "much lower than [he] would expect for the way [Claimant] present[ed] herself," Dr. Stockdale stated that "[i]t would be important to review any medical records from Dr. Evans . . . to get a sense about any past assessment of her intellectual and memory functioning. Id. Although some of Claimant's intelligence scores were low, Dr. Stockdale expressed the belief that Claimant would be able to manage any benefits she received. See id.

---

[14] "Cognitive Disorder NOS (not otherwise specified) is diagnosed when a patient has a syndrome of cognitive impairment that does not meet the criteria for delirium, dementia or amnestic disorders. [This condition is] often due to a specific medical condition and/or a pharmacological reaction." Depression-Guide.com, http://www. depression-guide .com/cognitive-disorder.htm.

17

In December 2001, Dr. Lucy Kras examined Claimant, reviewed Dr. Kawasaki's report, and prepared written findings. Dr. Kras indicated that when Claimant came in for her physical examination she was very friendly and upbeat with the nurse, but that she appeared anxious and somewhat depressed when she spoke to the doctor. See id. at 242. Claimant's physical behavior also varied depending on whether the doctor was present. Apparently, Claimant appeared to have trouble getting onto the examination table and walked in a bent over fashion when the doctor was in the area. See id. When the doctor was not present Claimant had an easy time getting onto a much higher x-ray table and walked in an erect fashion. See id. Initially, Claimant would not cooperate with muscle testing. See id. at 243. After coaching, Dr. Kras reported that she achieved a score of five out of five. See id.

Regarding the severity of her pain, Claimant indicated to Dr. Kras that "her pain kept her from working" her last job. Id. at 241. This statement conflicts with what Claimant told Dr. Lesnak a year earlier. At that time, she stated that if her office had not shut down, she would have continued working. See id. at 185. Conflicting record evidence also exists as to whether Claimant quit her job at MCI because of her pain, or simply because she did not like her work as a telemarketer. See id. at 185, 241.

Dr. Kras diagnosed Claimant with pain in the lower back, knees, and lower neck. See id. at 243. She made no focal findings during her neurological exam. See id. Given Claimant's degenerative joint disease, Dr. Kras believed Claimant suffered

18

from pain.  See id. at 244.  Nonetheless, she concluded that Claimant's mobility was "fairly good."  Id.  Dr. Kras found that Claimant could stand, walk, and sit for six out of eight hours in a normal workday, although she noted that Claimant may need to fluctuate between positions during that time.  See id.  She further opined that Claimant could occasionally (1) lift or carry up to ten pounds, and  (2) bend, stoop, or crouch.  See id.

## C.

In 2002, Claimant engaged Dr. Bethany Wallace as her primary physician.  See id. at 312.  Dr. Wallace obviously took Claimant's complaints of pain more seriously than had her previous physicians.  Indeed, Dr. Wallace appears to be the first treating physician of record to give Claimant a prescription for Lortab and Lidoderm patches, which dispense lidocaine (a local anesthetic).[15]  See id. at 307-08, 326.  Previously, the record shows Claimant primarily used Motrin, otherwise known as Ibuprofen, to relieve her pain.[16]  See, e.g., id. 131, 188, 237, 241, 465, 538, 566, 607, 657.  Dr.

---

[15] Claimant received a prescription for Vicodin, another form of hydrocodone, from an emergency room doctor in 2001.  See App. at 235.  One notation in 1997 also suggests Claimant was taking "one Vicodin at night-time" to help her sleep, but the record is unclear as to which physician issued this prescription.  Id. at 632.

[16] The record contains some indication that Claimant occasionally received various other treatments for her pain, including Skelaxin and Norflex (muscle relaxants), Naproxen (Aleve), a refreezable ice bag, and Theragesic cream (used to treat minor aches and pain).  See, e.g., App. at 179, 342, 346, 395, 612, 615.  None of these treatments, however, appear consistently in Claimant's medical records.  Indeed, a notation by Dr. Finn indicates that Claimant was "not interested in pursuing . . . medication management" – other than Motrin –  for her pain.  Id. at

19

Wallace also started Claimant on insulin to treat her diabetes.[17]  See id. at 311.

D.

At the Social Security Administration's request, two additional physicians reviewed Claimant's medical history to evaluate the severity of her condition.  In January 2002, an unknown government physician prepared a Functional Capacity Assessment of Claimant's physical condition.  While a physician with the first name of Jane signed this assessment, the physician's last name is not legible.  See id. at 154.  This physician concluded Claimant had a primary back disorder with a secondary diagnosis of knee pain and diabetes.  See id. at 154.  She specified that Claimant should frequently lift no more than twenty-five pounds, or sit/stand for more than six hours in an eight hour workday.  See id. at 148.  Overall, this physician concluded Claimant did have a medically determinable impairment.  See id. at 152.  She considered the severity or duration of Claimant's reported symptoms, however, to be disproportionately great when compared to those expected in a person of her condition.  See id.  Accordingly, this physician concluded Claimant's reported

---

[16](...continued)
566.

[17]  On appeal, Claimant seeks to rely on three short and highly cryptic notes from Dr. Wallace, which Claimant entered into the administrative record after the ALJ denied her claim.  The only note of particular relevance to this appeal indicates Claimant suffered some type of closed-head injury and had short-term memory problems.  See App. at 15.  As explained infra in Part IV.A.2.b, this note is not chronologically relevant.  See 20 C.F.R. § 404.970(b); id. § 416.1470(b).  Thus, the agency could not consider it and neither may we.

20

symptoms were only "partially credible" and that her condition did not "limit her from all work activities." Id.

In January 2002, Dr. Catherine Corsello, another government physician, prepared a Functional Capacity Assessment of Claimant's mental condition. Dr. Corsello diagnosed Claimant with a somatoform or pain disorder.[18] See id. at 159, 165. She found that Claimant was moderately limited in her ability to (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) maintain concentration for extended periods, and (4) complete a normal work schedule and perform at a consistent pace without an unreasonable number of rest periods. See id. at 155.

Dr. Corsello noted that Claimant, in completing various forms, "understood the questions," gave "coherent responses," and had "good spelling etc.," indicating that Claimant had "adequate cognition." Id. at 171. She found that Claimant's subjective complaints were "not fully credible" and discounted evidence of Claimant's poor cognition. Id. Dr. Corsello indicated that Claimant did not give her best effort during testing of her mental capacity and that her examiner's (i.e. Dr.

---

[18] Somatoform disorders are characterized by physical complaints for which appropriate medical evaluation fails to reveal a physical pathology, or when such complaints, and any resulting impairment, is grossly in excess of what would be expected from a patient's diagnoses. A pain disorder is one type of somatoform disorder in which psychological factors play an important role in the onset, severity, exacerbation, or maintenance of pain. See Dr. Dolores Protagoras-Lianos, http://www.emedicine.com/ped/topic1706.htm.

21

Stockdale's) findings would have been different if he had been able to review the notes of Claimant's psychologist, Dr. Evans. See id. Dr. Corsello noted that Dr. Evans believed Claimant was fully capable of returning to work. See id. at 171, 249. While Claimant exhibited psychological symptoms that could, at times, interfere with her ability to work, Dr. Corsello concluded that Claimant could adequately perform work not involving significant complexity or judgment. See id. at 157.

## III.

The Social Security Administration initially denied Claimant's application for supplemental social security benefits. Subsequently, the agency granted Claimant a hearing before an ALJ, thus providing Claimant with an opportunity to flesh out her disability claim. We proceed to summarize the course of events at Claimant's administrative hearing, as well as the contents of the ALJ's order denying Claimant supplemental benefits.

## A.

During the administrative hearing in this case, the ALJ engaged in a wide-ranging discussion with Claimant concerning her condition. Upon thorough questioning by the ALJ, Claimant stated that she was able to dress and bathe herself, gradually perform basic household tasks – such as laundry, cooking, cleaning – and drive for up to thirty minutes at a time. See id. at 42, 67. Claimant described undertaking the same general activities in November 1999. See id. at 499. When asked about her worst physical ailments, Claimant mentioned migraine headaches,

22

pain in her back and neck, and her diabetes.  See id. at 44.  When questioned about her mental condition and any treatment she was undergoing, Claimant stated that she was no longer seeing a mental health professional, but that she suffered from some "memory loss."  Id. at 47.

At one point, the ALJ asked Claimant, quite directly, why she could not work. Claimant stated that headaches and frequent trips to the restroom, which are necessary when her sugar level is high, prevented her from working.  See id. at 44, 51.  In regard to pain medications, Claimant indicated that she took hydrocodone.[19] See id. at 52, 69.  Upon close questioning by the ALJ, Claimant admitted that she had not been prescribed any medication used to treat the migraines of which she had earlier complained.  See id. at 52.  The only other significant pain treatments Claimant mentioned using were cortisone injections in her back and LidoDerm patches on her shoulders and knees.  See id. at 50, 63, 69.

When asked about her ability to sit for prolonged periods, Claimant indicated that her ability to sit varied widely day to day, but that, generally, she could sit for longer periods if she put her feet up and took her medications.  See id. at 54-55.

---

[19] Hydrocodone is used to treat moderate to moderately severe pain.  It is the most frequently prescribed opiate in the United States.  In its marketed form, hydrocodone is always combined with at least one other drug.  The most frequently prescribed combination pairs hydrocodone with acetaminophen.   Examples of medications that combine hydrocodone with acetaminophen are pain killers such as Vicodin and Lortab.  See U.S. Drug Enforcement Agency, http://149.101.1.32/dea/concern/hydrocodone.html.

23

Claimant later explained that some of her prescribed medications upset her stomach, so she does not regularly take them. See id. at 65. In addition, Claimant indicated that her pain disrupted her sleeping See id. at 66-67. As a result, Claimant stated that she regularly took naps for fifteen to twenty minutes throughout the day. See id.

After Claimant's testimony was complete, the ALJ elicited the opinion of Dr. Anthony Manuele, a vocational expert. See id. at 73. Dr. Manuele identified Claimant's past relevant work as customer service and telemarketing.[20] See id. at 74. The ALJ asked Dr. Manuele to assume a hypothetical individual limited to sedentary work, involving no significant complexity and occasional lifting. See id. at 74-75. The ALJ then inquired whether such a person would be able to work in the fields of customer service or telemarketing. See id. Dr. Manuele indicated that such a person could work in telemarketing but not in customer service, as the latter involved significant complexity. See id. at 75. Upon cross-examination by Claimant's counsel, Dr. Manuele further opined that this hypothetical individual's ability to engage in telemarketing would be adversely affected if she had to (1) take more than four fifteen to twenty minute naps during the workday, or (2) frequently move away from her work station, as opposed to merely engaging in postural shifts. See id. at 75-77.

_____

[20] Previously, Claimant worked at a mess hall, for a furniture company, in a gym, at a commissary, and as a hairstylist. See App. at 237-38. Claimant fittingly described herself as a "jack-of-all-trades." Id. at 238.

24

B.

In October 2003, the ALJ issued a fourteen page, single-spaced opinion denying Claimant's disability claim. Eight of these pages summarize Claimant's testimony and extensive medical history. First, the ALJ stated that Claimant had not engaged in substantial gainful activity since she filed her application for benefits. See id. at 21. Second, he summarized Claimant's testimony and her extensive medical history and concluded that Claimant's problems with her knees, neck, and back, and Claimant's somatoform disorder constituted "severe" impairments. See id. Third, the ALJ considered whether Claimant's impairments met the requirements of listings governing musculoskeletal impairments, disorders of the spine, and somatoform disorders. See id. He found that Claimant's impairments did not meet the requirements of these listings and that Claimant's impairments were not equivalent to any listing in the applicable regulations. See id. Fourth, the ALJ determined that Claimant's present impairments existed at "approximately the same level of severity" when she last engaged in full time work. Id. at 28-29. Accordingly, he concluded that Claimant could perform her past relevant work as a telemarketer. See id. at 31. The ALJ, therefore, ruled Claimant was not disabled, under the meaning of the SSA, and that she was thus not entitled to receive supplemental social security benefits. See id.

IV.

Claimant's first alleges that the ALJ failed to make a proper step three

25

determination regarding her alleged mental impairment. In sum, Claimant suggests that the ALJ should have concluded, despite her long and varied work history, that she suffers from a substantial mental disability. In this regard, Claimant argues the ALJ should have (1) considered listing 12.05(C), which covers mental retardation, (2) developed the record in regard to her cognitive and other psychological disorders, and (3) considered whether her mental impairments, in combination, equaled a listed impairment.[21] For the reasons that follow, we disagree.

A.

In order to satisfy listing 12.05, a claimant must "meet[]" the requirements of that listing's "capsule definition . . . [as well as] one of the four severity prongs for mental retardation as listed in the regulations." Lax, 489 F.3d at 1085. The capsule definition for listing 12.05 states: "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Ch. III, Pt. 404,

---

[21] Claimant's argument that the ALJ should have considered listing 12.05(C) at step three is curious, given that Claimant has not raised any allegations of error in regard to the ALJ's findings at step two. At step two, the ALJ concluded that Claimant suffered from "severe" impairments related to her knees, neck, back, and somatoform disorder. See App. at 21. The ALJ did not find that Claimant suffered a "severe" cognitive disorder and Claimant does not challenge this step two conclusion on appeal. Therefore, why Claimant believes the ALJ should have considered a listing related to mental retardation – a condition which the ALJ implicitly found Claimant did not suffer – is, at best, unclear.

Subpt. P, App. 1. The severity prong found in 12.05(C) – the provision at issue here – requires a showing of a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Lax, 489 F.3d at 1085.

1.

Importantly, Claimant never alleged that she suffered from a severe mental disability at her administrative hearing: The ALJ's failure to discuss listing 12.05(C) is, therefore, unsurprising. In fact, when the ALJ asked Claimant about her mental condition and any treatment she was currently undergoing Claimant merely stated that she was not under the care of a psychologist and that she suffered from "memory loss." App. at 47. Although the ALJ gave Claimant's counsel several opportunities to develop Claimant's case, Claimant's counsel also failed to raise the issue of a severe cognitive impairment or suggest that the record required development in that regard. See id. at 41, 61, 77.

ALJs are not required to "exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning. The standard is one of reasonable good judgment." Hawkins v. Chater, 113 F.3d 1162, 1168 (10th Cir. 1997). As such, an ALJ is generally entitled to "rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." Branum v. Barnhart, 385 F.3d 1268, 1271 (10th Cir. 2004). Nothing justifies excusing Claimant's counsel from this important duty here. The record in this case

27

demonstrates that the ALJ exercised good judgment in refusing to delve more deeply into the mental impairments Claimant now emphasizes on appeal.

Even assuming Claimant preserved this argument at step two, nothing in the record suggests Claimant can satisfy the basic requirements of listing 12.05. To come within the scope of listing 12.05, a claimant must satisfy that listing's capsule definition. See Lax, 489 F.3d at 1085 (explaining that a claimant seeking to come under listing 12.05 must meet the requirements of that listing's capsule definition, as well as one of four severity prongs). Part of listing 12.05's capsule definition is the requirement that a claimant exhibit subaverage general intellectual functioning before the age of twenty-two. See id. Nothing in the record indicates that Claimant exhibited signs of subaverage general intellectual functioning before age twenty-two. See App. at 776. Thus, the ALJ did not err in failing to consider the applicability of listing 12.05(C).

2.

Claimant also alleges the ALJ failed in his duty to develop the administrative record in regard to her cognitive and other psychological disorders. "In a social security disability case, the claimant bears the burden to prove her disability." Flaherty, 515 F.3d at 1071. To be sure, administrative disability hearings are "nonadversarial . . . and the ALJ has a duty to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." Id. Further, this duty "pertains even if the claimant is represented by counsel." Id. But

28

an ALJ's duty to develop the record is *not* unqualified.  See, e.g., Henrie v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 360-61 (10th Cir. 1993) (recognizing that an ALJ has a duty "to ensure that an adequate record is developed during the disability hearing *consistent with the issues raised*") (emphasis added).

a.

Several preconditions inform an ALJ's duty to develop the administrative record.  See Flaherty, 515 F.3d at 1071; Hawkins, 113 F.3d 1167.  Under normal circumstances, the ALJ may reasonably rely on "counsel to identify the issue or issues requiring further development."  Branum, 385 F.3d at 1271.  Moreover, a claimant need not only "raise" the issue she seeks to develop, but that issue must also be "substantial" "on its face."  Hawkins, 113 F.3d at 1167.  "Specifically, the claimant has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists."  Flaherty, 515 F.3d at 1071; see also 42 U.S.C. § 405(g) (stating that courts may only order the Commissioner of Social Security to take additional evidence "upon a showing that there is [1] new evidence which is material and that there is [2] good cause for the failure to incorporate such evidence into the record in a prior proceeding").

Because neither Claimant, nor her counsel, argued that memory loss contributed to Claimant's alleged disability, the ALJ did not err, under our precedents, in declining to develop the record in this regard.  See Flaherty, 515 F.3d at 1071; Hawkins, 113 F.3d at 1167; Branum, 385 F.3d at 1271-72.  While Claimant

29

did state that she suffered from some memory loss, a "mental impairment must be of a nature and degree of severity sufficient to justify its consideration as the *cause of failure to obtain any substantial gainful work*." Williamson v. Barnhart, 350 F.3d 1097, 1100 (10th Cir. 2003) (emphasis in original). A minor impairment of one's memory, which most individuals suffer as they age, does not rule out all substantial gainful activity. See id. ("In determining whether a severe impairment exists, the Commissioner considers the 'effect' of the impairment."). Neither Claimant nor her counsel ever argued that a cognitive impairment contributed to Claimant's inability to work. In fact, when asked what conditions hindered her from looking for employment, Claimant stated that migraines, pain in her neck and back, and diabetes prohibited her from working. See App. at 44. As such, the ALJ could reasonably assume that Claimant's stated memory loss had "no bearing on the question of [her] alleged disability." Chambers v. Barnhart, 389 F.3d 1139, 1144 (10th Cir. 2004); see also Glass v. Shalala, 43 F.3d 1392, 1396 (10th Cir. 1994) (rejecting the notion that an ALJ's duty of inquiry is "a panacea for claimants," requiring "reversal in any matter where the ALJ fails to exhaust every potential line of questioning").

b.

In any event, in the context of the entire record, Claimant failed to present evidence of a cognitive impairment that was substantial on its face. See Washington, 37 F.3d at 1439 (recognizing that "[s]ubstantiality of evidence" depends upon the "record taken as a whole"). Claimant primarily points to the opinions of Drs.

30

Stockdale and Wallace as evidence that she is mentally disabled.[22] Dr. Stockdale, a psychologist, saw Claimant on only one occasion. See App. at 236. He did not have access to the records of Claimant's most recent treating psychologist, Dr. Evans. See id. Dr. Stockdale diagnosed Claimant with cognitive disorder NOS, pain disorder with psychological factors, a general medical condition, and symptoms consistent with major depression recurrent and anxiety disorder NOS. See id. at 239. Dr. Stockdale's own observations, however, in light of Dr. Evans' findings over an extended period of treatment, make clear that his dim evaluation of Claimant's mental condition holds little weight. See 20 C.F.R. § 404.1527(d) (explaining how the Social Security Administration weighs medical opinions).

Dr. Stockdale obviously did not believe that his diagnosis of Claimant's condition was definitive. Notably, he observed that some of Claimant's scores from her cognitive testing "seemed much lower than [he] would expect for the way she present[ed] herself." App. at 239. Accordingly, he noted that it "would be important to review any medical records from Dr. Evans . . . to get a sense about any past assessment of [Claimant's] intellectual and memory functioning." Id. A review of Dr. Evans' records demonstrates that he initially had some concerns about

---

[22] All other evidence relating to Claimant's alleged cognitive deficiency is anecdotal, coming from individuals who neither had a treating relationship with the Claimant nor any psychological expertise. Thus, this evidence was not "significantly probative" and the ALJ did not err in discounting it without comment. Frantz v. Astrue, 509 F.3d 1299, 1303 (10th Cir. 2007); see also 20 C.F.R. § 404.1527(d).

Claimant's cognitive functioning. See id. at 269. Dr. Evans noted this concern, however, only in connection with his first meeting with Claimant. See id. Over the nine month period in which he treated Claimant, Dr. Evans' *never* indicated that Claimant had a cognitive disorder. Rather, he found Claimant to be "very capable." Id. at 248. Accordingly, Dr. Evans attempted to help Claimant engage in a more independent style of living, including a return to work. See, e.g., id. at 246-49, 251, 255, 262.

Claimant also points to a note written by Dr. Wallace – which Claimant presented to the Appeals Council after the ALJ had rendered his decision – as evidence that she suffers from a cognitive impairment.[23] The Social Security Administration only considers "new and material evidence" if such evidence "relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). In this case, the ALJ issued his decision in October 2003. See App. at 17. Dr. Wallace's note relates to a head injury Claimant sustained in November 2003. See id. at 15.

---

[23] Dr. Wallace's note tersely states that Claimant had some kind of "closed head injury with short-term memory problems" in November 2003. App. at 15. It does not describe the circumstances of Claimant's injury, its severity, or the duration of its effects. See id. Even if we were to consider this evidence, such a vague notation – in context of the entire record – cannot represent evidence Claimant suffered from a cognitive disorder that is *substantial on its face*. See Flaherty, 515 F.3d at 1071; Hawkins, 113 F.3d at 1167.

32

Because this evidence of Claimant's alleged cognitive disability does not "relate[] to the period on or before" the date the ALJ issued his decision, agency regulations prohibited the consideration of this evidence. 20 C.F.R. § 404.970(b); id. § 416.1470(b); Chambers, 389 F.3d at 1142-43. As the agency was not allowed to consider this evidence, neither may we: "If the evidence does not qualify, it plays no further role in judicial review of the Commissioner's decision." Chambers 389 F.3d at 1142. We, therefore, conclude that Claimant failed to present evidence of a cognitive impairment that was substantial on its face. Accordingly, the ALJ did not err in failing to develop the record in regard to Claimant's alleged mental disability.

3.

Claimant suggests that the ALJ also erred in failing to consider whether her psychological impairments, in combination, were equivalent to a listed impairment. But the only listing Claimant suggests her mental impairments arguably meet is listing 12.05(C). As noted above, that contention is meritless. See supra Part IV.A.1. To the extent Claimant seeks to argue her impairments, in combination, equal any other listing, she has failed to support this contention with any "developed argumentation." Hardeman v. City of Albuquerque, 377 F.3d 1106, 1122 (10th Cir. 2004). "Where an appellant lists an issue, but does not support the issue with argument, the issue is waived on appeal." Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1031 (10th Cir. 2007); see also 42 U.S.C. § 405(g) (stating that we review a district court's ruling in a social security

33

appeal "in the same manner as a judgment in other civil actions"). We, therefore, decline to consider this issue further.

B.

Claimant's second contention is that the ALJ incorrectly concluded, at step four, that her residual functional capacity rendered her capable of performing her past relevant work as a telemarketer. In determining a claimant's residual functional capacity, the ALJ must consider all of a claimant's impairments, whether or not they are "severe." See 20 C.F.R. § 416.945(a)(2). Hence, Claimant argues the ALJ erred in failing to consider (1) various physician-imposed restrictions on her work activities; (2) physical restrictions recommended after her functional capacity examination; and (3) the impact of her alleged mental impairments, specifically Claimant's headaches, fatigue, and pain disorder. At base, Claimant challenges the ALJ's conclusion that her condition has not changed, in any material respect, since she last engaged in full time work. See App. at 9-10.

1.

Claimant's allegation that the ALJ failed to consider the limitations imposed by her physicians is based upon an isolated comment in the ALJ's opinion, which states: "[A] review of the record in this case reveals no restrictions recommended by the treating doctor." Id. at 30. Contrary to the Claimant's assertions, this statement was not in error. At her administrative hearing, Claimant told the ALJ that the "only doctor" she currently saw for treatment was "Dr. Bethany Wallace."

34

Id. at 47. In his decision, the ALJ explicitly referred to Dr. Wallace as "the claimant's treating physician." Id. at 28. Therefore, when the ALJ pointed out that "the treating doctor" had recommended "no restrictions," he was merely observing that Dr. Wallace had not imposed any restrictions on Claimant's work activities. Id. at 30. Indeed, the record reflects that Dr. Wallace never recommended Claimant operate under any sort of restrictions.

To the extent Claimant argues the ALJ ignored other physician-imposed work restrictions, her claim similarly lacks merit. As a factual matter, no active physician-imposed restrictions existed for the ALJ to ignore. Undoubtedly, Dr. Finn placed Claimant on work restrictions in 1997, but – as Claimant's counsel admitted before the district court – Dr. Finn later lifted these restrictions. See id. at 551, 759. In 2001, Dr. Roberson concluded that Claimant had no permanent work restrictions as a result of her 1999 injury. See id. at 330. In what appears to be an effort to defer to Dr. Finn, however, Dr. Roberson erroneously stated that Claimant should continue to follow the restrictions Dr. Finn imposed in 1997. See id. at 330, 771. The record reflects, and the parties do not dispute, that these restrictions were lifted by Dr. Finn. See id. at 551, 759.

Accordingly, the ALJ's failure to discuss Claimant's rescinded work restrictions cannot be reversible error. See Haga v. Astrue, 482 F.3d 1205, 1207 (10th Cir. 2007) (noting that an ALJ is only required to "discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he

35

rejects"). No "uncontroverted evidence" exists that Claimant continues to be subject to work restrictions and rescinded restrictions do not constitute "significantly probative evidence" concerning Claimant's current condition. Consequently, the ALJ was simply not required to discuss these past limitations on Claimant's ability to work.

2.

Claimant also argues that the ALJ failed to adequately consider the physical limitations recommended as a result of Claimant's functional capacity evaluation. Presumably, this allegation refers to the results of the functional capacity evaluation performed by David Schlender in July 2000. Claimant, however, failed preserve this issue for our review. True, Claimant's counsel attempted to raise this point in the district court, but Claimant's counsel merely alleged (several times) that the ALJ failed to consider the "objective medical evidence." App. at 760-61. Because Claimant's counsel failed to present any developed argumentation in regard to Claimant's physical impairments, the district court obviously viewed this issue as waived: "The issues raised on appeal here, however, concern mental impairments; and therefore, the Court will not go through all of the medical evidence presented with regard to the impairments that are not the subject of the appeal."[24] Id. at 766-

---

[24] Indeed, the district court specifically stated that the "challenges" Claimant presented "on appeal" were "not directly related to the physical injuries that [she] suffered." See App. at 775.

67. Accordingly, the district court solely reviewed the ALJ's "assessment of [Claimant's] mental capability." Id.

The "perfunctory presentation" of Claimant's argument concerning her residual physical capacity "deprived [the district] court of the opportunity to analyze and rule on this issue now raised in detail for the first time on appeal." Tele-Commc'ns, Inc. v. Comm'r of Internal Revenue, 104 F.3d 1229, 1234 (10th Cir. 1997). Because Claimant failed "to state her theory below with the required specificity," she has "failed to preserve" this issue for our review. Id. Our precedents establish that we generally do "not consider an issue raised but not argued in the district court." Sac & Fox Nation of Missouri v. Pierce, 213 F.3d 566, 575 (10th Cir. 2000); see also Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co., 497 F.3d 1135, 1141 (10th Cir. 2007) (noting that the "'vague and ambiguous' presentation of a theory before the trial court" does not "preserve that theory as an appellate issue."); Harrell v. United States, 443 F.3d 1231, 1233 (10th Cir. 2006) (declining to address an issue where appellants "did not develop any argument" on point "in the district court"). In this case, we see no reason to depart from that general rule.

On the contrary, substantial reasons exist to enforce our waiver precedents here.[25] In this case, the district court explicitly "declined to address" the ALJ's

_____

[25] "In order to preserve the integrity of the appellate structure, we should not
(continued...)

37

assessment of Claimant's physical capacity because the "issue . . . was waived."

Schrader v. Fred A. Ray, M.D., P.C., 296 F.3d 968, 975 n.6 (10th Cir. 2002). We, therefore, refuse to address Claimant's argument for the first time on appeal. See United States v. Porter, 405 F.3d 1136, 1141-42 (10th Cir. 2005) ("We do not consider issues not presented to the district court, and they are deemed waived.").

3.

Claimant also challenges the adequacy of the ALJ's consideration of her alleged mental impairments, specifically her headaches, fatigue, and pain disorder.[26] Our review is focused first and foremost on whether the ALJ's decision is supported by substantial evidence and we conduct that inquiry via a meticulous examination of the "record as a whole." Flaherty, 515 F.3d at 1070; see also 42 U.S.C. § 405(g). The ALJ is not required to "discuss every piece of evidence." Frantz v. Astrue, 509 F.3d 1299, 1303 (10th Cir. 2007). On the contrary, we will generally find the ALJ's decision adequate if it discusses the "uncontroverted evidence" the ALJ chooses not to rely upon and any "significantly probative evidence" the ALJ decides to reject.

---

[25](...continued)
be considered a 'second-shot' forum . . . where secondary, back-up theories may be mounted for the first time. Parties must be encouraged to give it everything they've got at the trial level. Thus, an issue must be presented to, considered and decided by the trial court before it can be raised on appeal." Torres de la Cruz v. Mauer, 483 F.3d 1013, 1023 (10th Cir. 2007).

[26] Headaches, fatigue, and somatoform disorder are the only mental impairments Claimant raised before the district court. See, e.g., App. at 760, 778. Accordingly, these are the only mental impairments preserved for our review. See supra Part IV.B.2.

Id.

In his decision, the ALJ discussed Claimant's subjective complaints of headaches, fatigue, and pain in some detail. See App. at 23-28. The ALJ, however, found Claimant's testimony not to be "fully credible" based on the reports of "misrepresentation and malingering" submitted by Drs. Evans, Lesnak, and Kras.[27] Id. at 24-30; see also Winfrey v. Chater, 92 F.3d 1017, 1020 (10th Cir. 1996) ("Credibility determinations are peculiarly the province of the finder of fact . . . and we will not upset such determinations [if they are] supported by substantial evidence."). Therefore, the ALJ, quite reasonably, based his evaluation of Claimant's residual functional capacity predominately on the objective medical evidence in the record. See App. at 28-29.

a.

Claimant argues the ALJ failed to adequately consider her migraine headaches. The ALJ recognized that Dr. Finn diagnosed Claimant with "tension headaches," rather than migraines. Id. at 24. He noted that Claimant's current treating physician, Dr. Wallace, never indicated Claimant suffered from migraines. See id. at 28. Further, the ALJ observed that Claimant's treating physicians did not place her on any medication used specifically to treat migraines. See id. at 23. Clearly, the

---

[27]     Overwhelming record evidence supports the ALJ's conclusion that Claimant's testimony was not fully credible. Thus, in light of the entire record, any evidence that Claimant's testimony was reliable is not "significantly probative" and the ALJ did not error in failing to discuss it.

39

ALJ's discussion of Claimant's alleged migraines was more than adequate. See Flaherty, 515 F.3d at 1070-71 (approving the ALJ's discussion of a claimant's migraines under similar facts). Given that Claimant was never diagnosed with migraine headaches by her treating physicians or prescribed any medication to treat such a condition, substantial evidence supports the ALJ's discounting of Claimant's complaints of migraines.

b.

Claimant also argues the ALJ failed to account for her fatigue. Other than Claimant's subjective complaints, little evidence in the record relates to Claimant's problems sleeping. The ALJ properly discounted Claimant's testimony regarding her fatigue based on the substantial evidence in the record – which the ALJ thoroughly discussed in his decision – indicating Claimant engaged in "malingering or misrepresentation." App. at 30; see also id. at 24-29. The scant objective evidence in the record relating to Claimant's sleeplessness or fatigue is not "significantly probative." Thus, the ALJ did not err in declining to specifically discuss this issue.

In any case, the ALJ's generalized explanation for his decision, under the circumstances, was sufficient. Because he concluded Claimant's testimony was not fully credible, the ALJ focused his attention on Claimant's diagnosed "medical condition." Id. at 28. After examining Claimant's extensive medical history, the ALJ concluded that it would be "difficult to attribute [the] degree of limitation" Claimant alleged she experienced – including her reports of extensive napping – to

40

her identified medical impairments.  Id. at 28; see also 20 C.F.R. § 416.905(a) (stating that a claimant's disability must be predicated on a "determinable physical or mental impairment").  Clearly, substantial record evidence supports this conclusion.

c.

Claimant also suggests the ALJ essentially ignored her pain disorder.  The ALJ, however, specifically stated that Claimant's course of medical treatment was "essentially routine and/or conservative in nature."  App. at 28.  He also explained that Claimant's impairments were at "approximately the same level of severity prior to the . . . date" Claimant alleged she became disabled.[28]  Id. at 29.  Because Claimant's impairments – including her pain disorder – did not prevent her from working in the past, and the nature and severity of these impairments had not significantly changed, the ALJ reasonably concluded that Claimant's condition would not prevent her from performing her past relevant work.  See id.  The ALJ supported his conclusion with one of our precedents, which noted that "'disability' requires more than the mere inability to work without pain."  Id. at 30; see also Ray v. Bowen, 865 F.2d 222, 225 (10th Cir. 1989).

---

[28]  In her application, Claimant alleged she became disabled in December 1999.  Because disability benefits cannot be awarded for any period prior to the date a claimant files an application with the Social Security Administration, the alleged onset date of Claimant's disability, for purposes of her disability claim, is October 2001 – when Claimant filed her application for benefits.  See 20 C.F.R. § 416.335.

Under the facts of this case, the ALJ's analysis of Claimant's pain disorder was sufficient. Our precedents allow the ALJ to engage in less extensive analysis where "none of the record medical evidence conflicts with [his] conclusion that [a] claimant can perform light work." Howard v. Barnhart, 379 F.3d 945, 947 (10th Cir. 2004). Here, the ALJ "discussed all of the relevant medical evidence in some detail." Id. This discussion demonstrates the ALJ considered the Luna credibility factors in assessing Claimant's pain, including Claimant's (1) medication, (2) attempts to obtain relief, (3) frequent medical contacts, (4) description of her daily activities, and (5) credibility. See App. at 23-31; Branum, 385 F.3d at 1273-74. As the ALJ noted, the record submitted for his consideration did not contain *any* opinions from treating or examining physicians indicating that Claimant was totally disabled.[29] See App. at 30. Where – as here – the "ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's [residual functional capacity], the need for express analysis is weakened." Howard, 379 F.3d at 947.

Clifton v. Chater, 79 F.3d 1007 (10th Cir. 1996), in which we first established

---

[29] A short prescription written by Dr. Wallace, in order to give Claimant access to pool therapy at the YMCA, could be read to this effect, as it states Claimant is "disabled permanently." App. at 16. Claimant submitted this note to the agency after the ALJ issued his decision. Because this note relates to a period before the ALJ issued his decision, we may consider it. See supra Part IV.A.2.b. Such an obscure prescription, which contains no medical findings, however, is clearly insufficient to change our analysis.

that ALJs must sufficiently explain the reasons for their rulings, is not to the contrary. Our decision in <u>Clifton</u> was predicated on the fact that the ALJ's decision stated but a "bare conclusion . . . beyond meaningful judicial review." <u>Fischer-Ross</u>, 431 F.3d at 730, 734. In this case, the ALJ's reasoning is far more extensive. <u>See</u> <u>Howard</u>, 379 F.3d at 947 (distinguishing <u>Clifton</u> on this basis). Moreover, we have previously rejected "a construction of <u>Clifton</u> that, based on a reading of the ALJ's decision as a whole, would lead to unwarranted remands needlessly prolonging administrative proceedings." <u>Fischer-Ross</u>, 431 F.3d at 730. Here, a remand would serve no other purpose than to needlessly prolong a protracted course of proceedings, which has already spanned over seven years.

Further, Claimant's extensive medical history demonstrates that substantial evidence supports the ALJ's decision in regard to Claimant's pain disorder. Claimant has, in fact, received remarkably conservative treatments for her pain. The record also shows that Claimant's pain disorder is longstanding in nature and that her condition, in this regard, had not seriously declined since she last performed full time work. To the extent the record suggests Claimant's pain hinders her mental faculties, substantial evidence supports the ALJ's decision to account for this impairment by concluding Claimant has "mild restriction in daily living activities, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation." App. at 31. Accordingly, the ALJ limited Claimant's residual functional capacity to work

43

involving "less complexity and judgment that could be learned in up to three months," which required working no more than "a total of approximately six hours in an eight hour workday." Id. at 30-31. In sum, substantial evidence supports the ALJ's evaluation of Claimant's mental residual functional capacity. On appeal, we may not "reweigh the evidence or try the issues de novo" in order to advance a different view. Grogan, 399 F.3d at 1262.

C.

Finally, Claimant suggests that the ALJ evaluated Claimant's credibility under an improper standard. She bases this argument on the ALJ's statement that "[Claimant's] allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." App. at 28. The ALJ, however, made this statement subsequent to, and thus in light of, his adverse determination of Claimant's credibility. See id. The context of the ALJ's comment makes this distinction clear:

> The undersigned does not find the testimony of the claimant, that she is unable to sustain any full time work activities, to be fully credible. Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, *allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty.* Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, in view of other factors discussed in this decision.

Id. (emphasis added).

As shown above, the ALJ's statement that Claimant's daily limitations could

44

not be "objectively verified with any reasonable degree of certainty" did not state a standard by which the ALJ made his adverse determination of Claimant's credibility. Id. Rather, the ALJ's statement was merely a common sense observation that the ALJ would not treat Claimant's testimony as "strong evidence" of her disability due to his prior determination that Claimant's testimony was not "fully credible." Id. Claimant simply misconstrues the ALJ's comment in suggesting otherwise.

We recognize that an ALJ's credibility determination must be "closely and affirmatively linked" to substantial record evidence. Hardman, 362 F.3d at 678-79. In this case, the ALJ did just that. In his decision, the ALJ clearly and affirmatively linked his adverse determination of Claimant's credibility to substantial record evidence indicating Claimant engaged in malingering and misrepresentation. See App. 24-30; Winfrey, 92 F.3d at 1020. Our precedents do not require more, and our "limited scope of review precludes [us] from reweighing the evidence or substituting [our] judgment for that of the" agency. Flaherty, 515 F.3d at 1071.

V.

Where, as here, the ALJ indicates he has considered all the evidence our practice is to take the ALJ "at [his] word." Flaherty, 505 F.3d at 1071. We have every reason to abide by this well-established principle here. In its entirety, the "ALJ's discussion of the evidence and his reasons for his conclusions" demonstrate that he adequately considered Claimant's alleged impairments. Flaherty, 515 F.3d at 1071; see also Fischer-Ross, 431 F.3d at 730 (evaluating whether the substantial

45

evidence test had been met "based on . . . the ALJ's decision as a whole").

Accordingly, we AFFIRM the ruling of the district court. Appellant's motion to proceed in forma pauperis is denied.

*No. 06-1029, Wall v. Astrue*

**HOLLOWAY**, Circuit Judge, dissenting:

Being unable to concur in the disposition of the majority opinion, I respectfully dissent. My reasons for my conclusion are stated below.

Here, Claimant Joan Wall appeals from the denial of her application for supplemental security income (SSI) benefits under Title XVI. We have jurisdiction under 42 U.S.C. § 405(g). Because the administrative law judge (ALJ) failed to provide a sufficient explanation of his weighing and balancing of the evidence to support his findings at both step three and step four, I would reverse and remand for additional proceedings.

Facts and Procedural History

I review only a few facts from the extensive record in this case. Claimant was born on February 5, 1942, making her sixty-five years old now. Aplt. Admin. App. at 41. She finished the ninth or tenth grade at school, completed a G.E.D. at the age of forty, and completed hairstyling and cosmetology school. Id. at 42-43. Her full-scale IQ was tested in November 2001 to be 67. Id. at 238. She has been married and divorced three times and lives alone in a townhouse in Colorado Springs provided by her son. Id. at 41-42, 97, 236, 241.

Claimant has had several jobs. Her past relevant work was as a telemarketer at MCI Worldcom from October 1997 to April 1998, id. at 62, 111, 119, and as a customer service representative at Telequest from April 1998 to

August or October 1999, id. at 111, 119, 145, 175. She testified that she voluntarily worked eleven to twelve hours a day at MCI, including on some weekends and holidays, because she loved the job and the people. Id. at 62, 71-72. She said that she stopped working in September 1999 after she was injured in a fall at work. Id. at 43-44, 61-62. Around the same time that she was injured, Telequest closed its office in Colorado Springs. Id. at 174. Claimant protectively filed her application for SSI benefits on October 9, 2001, alleging a disability beginning on December 30, 1999, due to "pain in both knees, both legs, and her lower back, spasms, stiff neck, memory problems, sleep problems, diabetes mellitus Type II and migraine headaches." Id. at 20.

The lengthy administrative record contains claimant's medical records dating back more than ten years, showing visits to or review by numerous medical professionals for both physical and mental problems. These records contain evidence of claimant's past medical treatment that apparently resolved individual medical problems (e.g., hysterectomy and carpal tunnel release), as well as evidence of chronic or degenerative medical problems (e.g., diabetes, hypertension, knee problems, depression, and pain).

Claimant's medical records also document her extensive attempts to resolve injuries resulting from a series of accidents. In the nineties, she was in a car accident—another vehicle rear-ended her vehicle as she sat at a stoplight. Id. at 184, 270, 667. The accident caused injuries to her back and neck, and she was

treated by Kenneth P. Finn, M.D.  Id. at 667-70.  In August 1999, she fell in the

restroom while working at Telequest.  Id. at 44, 173, 187, 270.  She slipped in

some water on the floor, falling forward onto her knees.  Id. at 44, 173, 270.

When she tried to get up, she fell backward onto her back and buttocks.  Id.

at 173, 270.  She was treated by Dr. Finn, id. at 538-40, and other doctors.  An

MRI revealed a posterior medial meniscal tear, id. at 538, which prompted a

debate among claimant's doctors as to whether she should have surgery on her

knees.  Their conclusion was that she should not, either because it would not

reduce her pain or because complications were likely because of her diabetes, see,

e.g., id. at 68, 252-55, 257, 259, 263, 317, 538.  She went to physical therapy for

several months.  Id. at 173.  In March 2002, claimant fell when her son and his

wife took her on vacation.  Id. at 57-58.  She tripped on a rug at the hotel, falling

and breaking her left arm in four places.  Id. at 57-58, 315.

A hearing was held before an administrative law judge (ALJ) on May 20,

2003.  After the hearing, the ALJ denied benefits in a written decision filed on

October 21, 2003.  Id. at 20-33.  Noting evidence stating that claimant was not

injured in her 1999 fall beyond her preexisting injuries, he concluded that she quit

working, not because of the fall, but because Telequest closed its office in

Colorado Springs and she was paid lost wages.  Id. at 29.  He determined at step

one that claimant had not worked since she filed her application for SSI benefits.

Id. at 21.  He concluded without explanation at step two that "[t]he evidence

supports a finding" that claimant had suffered injuries to her neck, back, and knees, and that she had a somatoform disorder.  Id.  He determined at step three that claimant did not satisfy the specific listings either for disorders of the spine, Listing 1.04, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04, or for somatoform disorder, Listing 12.07, id. § 12.07, or, generally, any other listing.  Aplt. Admin. App. at 22.  The ALJ concluded at step four that claimant retained the residual functional capacity (RFC) for a full range of sedentary work, "sitting a total of approximately six hours in an eight hour workday, with normal breaks, and occasional walking and/or standing."  Id. at 30.  He further determined that "claimant's mental condition would permit work of less complexity and judgment that could be learned in up to three months."  Id. at 31.  Based on evidence adduced at the hearing from a vocational expert (VE), the ALJ concluded that claimant could return to her past job as a telemarketer with those limitations.  Id. As a result, he determined at step four that claimant was not disabled and was not entitled to SSI benefits.  Id.

In addition to the arguments on the existing record she made in her appeal to the Appeals Council, claimant presented some additional evidence, not previously submitted to the agency, that she had been diagnosed with a closed head injury with short-term memory problems by her current doctor, who did not consider her to be a malingerer.  Id. at 12, 14, 15.  This additional evidence was made a part of the record.  Id. at 9.  Nevertheless, the Appeals Council denied

review, making the ALJ's decision the agency's final decision. Id. at 6-8. Claimant filed suit in the district court, which also denied relief. Claimant filed this appeal.

## Standard of Review

"This court reviews the [agency's] decision to determine whether the findings are supported by substantial evidence and whether the [agency] applied correct legal standards." Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992) (quotation omitted). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quotation omitted). "In order to determine whether the [agency's] decision is supported by substantial evidence, we must meticulously examine the record. However, we may neither reweigh the evidence nor substitute our discretion for that of the [agency]." Musgrave, 966 F.2d at 1374.

## Issues on Appeal

Claimant argues on appeal that the ALJ erred at steps three and four of the five-part evaluation sequence. See Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five-part evaluation sequence). Claimant argues that the ALJ failed to make a proper step three finding: (1) by failing to consider whether her mental impairments met or equaled one of the listings for mental

retardation, Listing 12.05C, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C, or another listing; (2) by failing to develop the record with regard to her cognitive and other mental disorders in addition to somatoform disorder; and (3) by failing to consider her impairments in combination. She also argues that the ALJ erroneously found at step four that she was capable of performing her past relevant work as a telemarketer: (4) by failing to find that her treating physicians had issued restrictions on her ability to work; (5) by failing to consider restrictions on the agency's RFC assessment; (6) by erroneously applying a "reasonable degree of certainty" standard to her capacity to perform household tasks, Aplt. Admin. App. at 28; and (7) by failing to consider her diagnosed mental impairments other than somatoform disorder. The agency argues that any errors are harmless. Based on my review, claimant's assertions of error have merit.

Discussion

At step three, the ALJ considers whether a claimant's impairments meet or equal a listed impairment.  Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996).  Claimant argues that in light of the diagnosis by Steven Stockdale, Ph.D., that she had a cognitive disorder NOS, major depression recurrent, and anxiety disorder NOS and a full scale IQ of 67, Aplt. Admin. App. at 239, the ALJ should have considered whether she met or equaled one of the listings for mental retardation, Listing 12.05C, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C, or another listing.  She claims that she meets or equals Listing 12.05C.  Aplt. Opening Br. at 13.

To me, the ALJ's decision does not reflect that he considered whether or not claimant met or equaled Listing 12.05C, which may be understandable since claimant did not argue at the hearing that she met or equaled this Listing.  This does not effect a waiver in this court, see Sims v. Apfel, 530 U.S. 103, 108-12 (2000), but only may explain why the ALJ did not address Listing 12.05.  The ALJ's failure to consider Listing 12.05C was an error, however, because the record contains some evidence showing that claimant satisfied the requirements of Listing 12.05C to show a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. Pt. 404, Subpt. P,

-7-

App. 1, § 12.05C. It is for the ALJ to make appropriate findings in the first instance. E.g., Allen v. Barnhart, 357 F.3d 1140, 1144 (10th Cir. 2004); Clifton, 79 F.3d at 1009-10 (citing 42 U.S.C. § 405(b)(1)). Therefore, I would remand the question of whether claimant meets or equals Listing 12.05C to the ALJ.

The agency urges us to conclude that claimant cannot meet or equal Listing 12.05C because the ALJ has already found that she did not satisfy the "B" criteria of Listing 12.07, Aplt. Admin. App. at 22, foreclosing a finding that she satisfies the "B" criteria of Listing 12.05. An examination of these two Listings, however, shows that Listing 12.05 has neither the same structure nor the same "B" criteria as Listing 12.07. Therefore, the agency's argument is without merit.

The agency also argues that claimant has not presented any evidence to satisfy the first sentence in Listing 12.05, called, alternatively, the "capsule definition" or the "diagnostic description." See, e.g., 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00A. The capsule definition requires claimant to show "significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." Id. § 12.05. The agency's argument asks us to overstep our authority, however. "[A]s a court acting within the confines of its administrative review authority, we are empowered only to 'review the ALJ's decision for substantial evidence' and, accordingly, 'we are not in a position to draw factual conclusions on behalf of the

-8-

ALJ.'" Allen, 357 F.3d at 1144 (quoting Drapeau v. Massanari, 255 F.3d 1211, 1214 (10th Cir. 2001)). Because the ALJ did not expressly consider Listing 12.05, I would remand for the ALJ to make appropriate findings in the first instance, which is his duty to do. 42 U.S.C. § 405(b)(1). For the remand, I note that we have previously pointed out that the agency has never adopted a standard of measurement for the term "deficits in adaptive functioning" in the capsule definition of Listing 12.05. Barnes v. Barnhart, 116 F. App'x 934, 942 (10th Cir. 2004). The Commissioner publicly announced in April 2002, after claimant filed her application for SSI benefits, that the four major professional organizations dealing with mental retardation each has a somewhat different standard for measuring "deficits in adaptive functioning," but the Commissioner expressly declined to adopt any particular one of them. 67 Fed. Reg. 20,018, 20,022 (Apr. 24, 2002). Rather, the Commissioner "allow[s] use of any of the measurement methods recognized and endorsed by the professional organizations." 67 Fed. Reg. at 20,022. The ALJ therefore should choose a standard of measurement and notify claimant what it is.

I cannot conclude that the ALJ erred by failing to consider any other listings, since claimant does not specify any other listings which she arguably equals or meets.

Claimant also argues that the ALJ erred at step three by failing to develop the record with regard to her cognitive and other mental disorders. Because I

would remand based on <u>Clifton</u> error, I would leave it to the ALJ to determine what further record development may be required. <u>See, e.g.</u>, <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1167 (10th Cir. 1997).

Claimant's final step-three argument is that the ALJ erred by failing to consider her impairments in combination. It goes without saying that, on remand, claimant's impairments must be considered singly and in combination. 42 U.S.C. § 423(d)(2)(B); <u>Hargis v. Sullivan</u>, 945 F.2d 1482, 1491 (10th Cir. 1991).

<u>Step Four</u>

At step four, I am convinced that the ALJ should determine the claimant's RFC, the requirements of the claimant's past relevant work, and whether they match. <u>Winfrey v. Chater</u>, 92 F.3d 1017, 1023 (10th Cir. 1996). Claimant makes a number of valid arguments at this step.

Claimant argues that the ALJ erroneously found that she was capable of performing her past relevant work as a telemarketer by failing to find that her treating physicians and the agency consulting physician issued restrictions on her ability to work. While the ALJ was not necessarily bound to make his RFC finding consistent with such restrictions, I do agree that evidence of such restrictions exists in the record, and the ALJ was required to explain why he rejected it. <u>See</u> <u>Clifton</u>, 79 F.3d at 1009-10. For example, the record contains recommendations from several professionals over a period of years that claimant

should change positions during the day.  E.g., Aplt. Admin. App. at 597 (Finn, 1997, claimant should change positions every forty-five to sixty minutes), 506 (Schlender, 2000, recommending that claimant do sedentary work with "frequent breaks throughout the work day"), 330 (Roberson, February 2001, claimant should follow restrictions set out by Dr. Finn in 1997), 244 (Kras, December 2001, claimant may "need to fluctuate between positions" to maintain work during an eight-hour day).  Claimant testified that she can sit for an hour or two on a Lazy Boy,  id. at 54, but that some days are better than others and she sometimes "can't even sit maybe more than, what, 30 or 40 minutes without taking, you know, the medication," id. at 55, and that with medication she can sit for at least an hour before taking a fifteen-minute break to walk around and get her circulation going, id.

The ALJ did not explain why he rejected the evidence that claimant should take frequent breaks from sitting.  This omission was error, because "in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  Clifton, 79 F.3d at 1009-10.  The VE's response to claimant's attorney's question including a restriction on sitting cannot overcome this failing because the ALJ made no finding, specific or otherwise, that claimant needed to change positions frequently.  The ALJ found that she could work "with normal breaks," Aplt. Admin. App. at 30, defined by the VE to

be a fifteen-minute break in the morning and afternoon and a thirty-minute break for lunch. Id. at 77. Several professionals recommended that claimant change positions more frequently than that, and claimant testified that she needed to walk around for fifteen minutes after sitting for an hour, to get her circulation going. Id. at 55. The VE testified that the telemarketer job would allow an employee "to take a postural shift, but if that individual has to move away from whatever they're doing in the productivity area, then no, they would not be able to do it." Id. at 77. I cannot conclude that it was harmless error for the ALJ to fail to explain why he rejected the evidence that claimant should not do prolonged sitting, and I would remand this issue to the ALJ.

Claimant also argues that the ALJ erred by discounting her testimony that her daily activities are fairly limited because they could not "be objectively verified with any reasonable degree of certainty." Id. at 28. This argument has merit. I am unaware of—and the agency has not identified—any statute, regulation, ruling, or case law directing an ALJ to "objectively verify" by a "reasonable degree of certainty" whether a claimant's daily activities are as limited are as he or she asserts. The standard for an adverse credibility determination is not whether the claimant's testimony can be objectively verified. Rather, an adverse credibility determination must be (1) "closely and affirmatively linked" to the evidence, and (2) based on evidence that

is "substantial."  Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quotation omitted).

Claimant also argues that the ALJ erred by failing to consider her diagnosed mental impairments other than somatoform disorder.  I agree.  "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  S.S.R. 96-8p, 1996 WL 374184, at *4.  The record includes numerous references to diagnoses touching on claimant's mental state, including depression, see, e.g., Aplt. Admin. App. at 177, 184, 239, 246-54, 256-57, 260-64, 271, 550, 645; anxiety, see, e.g., id. at 239, 253, 264-65, 539, 577, 579; panic attacks, see, e.g., id. at 246-48; pain disorder, see, e.g., id. at 182, 194, 239, 244, 246-69; cognitive disorder, see, e.g., id. at 239; fear, see, e.g., id. at 246-48, 250, 253, 264-65; and closed head injury with short-term memory problems, id. at 12.  The ALJ should have explained why he accepted the diagnosis of somatoform disorder but rejected the diagnoses of other mental impairments, such as these.  See Clifton, 79 F.3d at 1009-10.  On this point, I note the ALJ's emphasis on a March 28, 2000 comment by James H. Evans, Ph.D. that claimant's depression was not "debilitating," but that she was "very, very difficult to motivate to do much of anything at this point," was "too comfortable living off lost wages and not being motivated to return to work."  Aplt. Admin. App. at 29-30.  Although Dr. Evans did make that comment, id. at 260, he also stated in the same note that claimant

-13-

suffered "intractable pain [and] reactive depression" id., and in a number of subsequent notes continuing through his last note on August 15, 2000, that claimant suffered "intractable pain, fear, anxiety and mild to moderate depression," id. at 246; see also id. at 247-57, 259. In other notes from his office, he or his staff stated that claimant was following through on his instructions or her own plans to become more active. Id. at 248, 261, 266, 275, 282, 284-89. In addition to these inconsistencies, Dr. Evans' comment that claimant was hard to motivate is inconsistent with evidence from June 2001 from E. J. Ausman, D.O. Id. at 205, 208. Dr. Ausman wrote in May 2001 that claimant's diabetes was in extremely poor control because of her noncompliance and that he told her that she needed to "get absolutely serious" about her diabetes. Id. at 208. He recorded one month later that claimant "has actually been taking her medication," had lost weight, was exercising and trying to stay active, was asking questions about the diet she was supposed to be following, and that her blood pressure was better. Id. at 205.

I also see no information in the record as to how long claimant received lost wages from Telequest's closing; I doubt that any benefits from that layoff would continue indefinitely. Claimant testified at the hearing that she received assistance from the State of Colorado, but she would rather work if she could. Id. at 72. And Dr. Evans noted her concern that she was struggling financially, id. at 262, and her desire to "get back to work to generate her normal income," id.

-14-

at 271. These are examples of inconsistencies in the record that the ALJ should resolve through weighing and balancing of the evidence, not merely stating conclusions.

Accordingly, I respectfully dissent. I would reverse and remand this proceeding to the district court with directions to remand to the agency for additional proceedings consistent with my views on disposition.