FILED
United States Court of Appeals
Tenth Circuit

March 17, 2010

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

KAREN CRANE,

Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security Administration,

Defendant-Appellee.

No. 09-3137
(D.C. No. 6:08-CV-01055-JTM)
(D. Kan.)

ORDER AND JUDGMENT[*]

Before **HARTZ**, **McKAY**, and **ANDERSON**, Circuit Judges.

Karen Crane appeals from a judgment of the district court affirming the

Commissioner's denial of her application for Social Security disability benefits

and supplemental security income benefits. Exercising jurisdiction under

28 U.S.C. § 1291 and 42 U.S.C. § 405(g), we affirm.

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

I.

Ms. Crane was 47 years old at the time of her final hearing before the administrative law judge (ALJ). In her July 23, 2002, application, she claimed disability as of January 1, 2001, due to "[n]umbness in legs, muscles tightening up – stiffness, makes walking extremely hard to do every day it gets worse." R. Vol. 2 at 134. In October 2002, Ms. Crane had back surgery. The ALJ conducted two hearings. The first hearing took place on October 13, 2004. When asked about his theory of the case, Ms. Crane's lawyer explained:

> I think she's disabled [at] five of the sequential process. She had a serious back surgery, which the, an MRI following the surgery showed she still had spinal cord problems that would justify her complaints. She also has mental impairments. . . . [S]he's also started [mental health] treatment . . . just last month[,] [b]ut we haven't been able to obtain . . . that record yet.

*Id*. at 838-39.

Among the records presented was a December 2002 consultative mental status examination that contained a diagnosis of dysthymia, but the examiner had concluded that this impairment resulted in either no or only mild functional limitations. Ms. Crane's lawyer also offered records from a February 2004 visit to the emergency room, which contained a clinical impression of "anxiety." *Id*. at 744. The visit occurred after she was licked by a dog that she believed to have been poisoned. Ms. Crane sought mental-health treatment beginning in September 2004, and her lawyer had requested the records of that treatment.

In addition, the ALJ heard testimony from Ms. Crane. At the conclusion of the hearing, he referred her for a "psych CE [consultative examination], with appropriate testing," *id*. at 865, and "an orthopedic CE, since the previous CE was done on a prospective type basis, because they expected her to improve [after surgery]," *id*. at 866. The second hearing was held on June 14, 2005. Ms. Crane again testified, along with a vocational expert.

In his decision the ALJ found that Ms. Crane had a number of severe impairments that precluded her from performing her past relevant work. At step five of the five-step sequential evaluation process, however, he found that the Commissioner had met his burden of proving that Ms. Crane retained sufficient residual functional capacity to perform other work in the national economy. He thus concluded that she was not disabled. The Appeals Council denied her request for review, making the ALJ's denial of benefits the agency's final decision. The district court affirmed.

II.

Because we review de novo the district court's ruling in a social security case, "we independently determine whether the ALJ's decision is free from legal error and supported by substantial evidence." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a

preponderance." *Id.* (internal quotation marks omitted). "[W]e neither reweigh the evidence nor substitute our judgment for that of the agency." *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991).

A.

At step two of the five-step sequential evaluation process, the ALJ determines whether the claimant has a medically severe impairment or impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *see also Wall,* 561 F.3d at 1052. The ALJ found that Ms. Crane had the following medically determinable severe impairments: "dysthymic disorder; learning disorder; degenerative disk disease-lumbar spine; subdural extramedullary mass, status post surgery; and, migraine headaches." R. Vol. 2 at 30. Ms. Crane argues that the following impairments were also medically determinable and that the ALJ erred when he did not include them in his analysis of her residual functional capacity at step four: schizoaffective disorder; paranoid personality disorder; obsessive compulsive personality disorder; and general anxiety disorder.

We summarize the pertinent evidence before turning to the analysis. On December 18, 2002, Jill Spradlin, Psy.D., met with Ms. Crane at the Cowley County Mental Health & Counseling Center (Cowley). According to Dr. Spradlin, Ms. Crane was referred "to get a statement . . . so that she could have a hysterectomy." *Id.* at 791. After listing her diagnostic impression of "Schizoaffective Disorder" and "[rule out] Paranoid Personality Disorder,"

-4-

Dr. Spradlin wrote: "It is highly recommended that Ms. Crane undergo a full psychological evaluation to fully assess her diagnosis. Psychological testing, including personality testing with measures of validity is recommended." *Id.* at 793. But testing was not completed, because Ms. Crane did not respond "[a]fter numerous attempts to reach her and encourage her to finish the testing." *Id.* at 778. Dr. Spradlin closed the file in April 2003.

Ms. Crane returned to Cowley in September 2004, in response to the anxiety she experienced in February 2004 when she was licked by a dog. This time she was seen by Alan Smith, a marriage-and-family therapist. He wrote, "[She] states that the reason she is out here is because of medical conditions and financial stress." *Id.* at 785. He diagnosed her with generalized anxiety disorder and obsessive-compulsive personality disorder. Mr. Smith closed Ms. Crane's file on March 7, 2005, because "[s]he attended two appointments, no showed once and did not respond to a contact letter." *Id.* at 777. Her last visit to Cowley was on April 4, 2005, when she was seen by Kathy Schwinghammer, also a marriage-and-family therapist. Ms. Crane "reported symptoms of depression, which she feels stem from conflicts with her boss at work." *Id.* at 780. Ms. Schwinghammer listed, among other things, general anxiety disorder and personality disorder in her diagnosis.[1]

_____

[1]    Ms. Schwinghammer also included dysthymia and a learning disorder in her diagnosis. The ALJ found these were medically determinable impairments on the
(continued...)

There is no need for an extended discussion of the diagnoses of generalized anxiety disorder, obsessive compulsive disorder, or personality disorder. Marriage-and-family therapists, such as Mr. Smith and Ms. Schwinghammer, are not acceptable medical sources; and only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment. 20 C.F.R. §§ 404.1513(a) and 416.913(a). *See also Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (explaining that under § 1513(a), evidence from an acceptable medical source is required to establish a medically determinable impairment).

Ms. Crane argues that the ALJ should have considered Mr. Smith's and Ms. Schwinghammer's reports because their opinions were bolstered by the opinions of Drs. Daehnke and Murphy. To be sure, evidence or opinions from non-medically acceptable sources are not always irrelevant. For example, "evidence from other sources [may be used] to show the severity of . . . impairment(s) and how it affects your ability to work." 20 C.F.R. §§ 404.1513(d) and 416.913(d). *See also* SSR 06-03P, 2006 WL 2329939, *2 (same). Both the regulations and ruling, however, are clear that information from

---

[1](...continued)
basis of evidence from medically acceptable sources, and included them in his disability evaluation.

non-medically acceptable sources cannot *establish* a medically determinable impairment.[2]

Also cited as error is the ALJ's failure to subpoena Mr. Smith's and Ms. Schwinghammer's treatment notes.  The agency suggests several reasons why the ALJ's failure to do so is not error, but we need address only one:  their notes, if any, are irrelevant because neither is an acceptable medical source whose opinion could establish a medically determinable impairment.

As for the claim that Ms. Crane suffers from schizoaffective disorder, we recognize that Dr. Spradlin is a medically acceptable source.  But the ALJ rejected for several reasons her diagnosis of schizoaffective disorder, finding it insufficient to establish a medically determinable impairment.  He wrote:

> The claimant was diagnosed in December 2002 with a schizoaffective disorder by a non-treating medical source who saw the claimant on only one occasion.  However, it is documented that claimant had an acute psychosis at one point, which was possibly due to delirium.  Even so, the diagnosis of schizoaffective disorder . . . is not supported by the evidence or by any test.  In addition, the symptoms justifying this diagnosis did not last 12 months, as required by the regulations.  The examining doctor recommended that the claimant undergo a full psychological evaluation to fully assess her diagnosis.  The record does not substantiate that a full psychological evaluation was done.

R. Vol. 2 at 34 (citations omitted).  Ms. Crane does not point to any legal error or the lack of substantial evidence to support the ALJ's finding.  Instead, her

---

[2]    Ms. Crane does not argue that the ALJ erred by failing to adopt the diagnoses of anxiety made by Drs. Daehnke and Murphy.

argument is for a reweighing of the evidence, which we cannot do. "We review only the *sufficiency* of the evidence, not its weight[.]" *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007).

For similar reasons we disagree with Ms. Crane's contention that the ALJ erred by failing to discuss her global assessment of functioning (GAF) score of 41 when she met with Dr. Spradlin in 2002.[3] The ALJ is not required to discuss every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). To be sure, he must discuss the evidence supporting his decision, and in addition he "must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects." *Id*. at 1010. But Dr. Spradlin's GAF evaluation was not uncontroverted; and the ALJ, for the reasons given for his not accepting Dr. Spradlin's diagnosis, did not need to find her GAF scoring to be significantly probative. We also reject Ms. Crane's argument that the ALJ should have performed his own evaluation and interpretation of the consultative psychological examination performed by Dr. Schwartz in November 2004; an ALJ cannot substitute his own medical opinion for that of a physician. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1221 (10th Cir. 2004).

---

[3] The GAF is a subjective determination using a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (Text Revision 4th ed. 2000). A GAF score of 41 indicates "[s]erious symptoms." *Id*. at 34.

Finally, to the extent that Ms. Crane contends that the ALJ did not consider that she had an impairment from panic attacks, we note that the only evidence concerning panic attacks came from Ms. Crane. She testified: "[M]y chest hurts because my heart's pounding really fast. . . . [S]ometimes I feel really hot. I don't know if it's a hot flash or if it's related to my panic attacks. . . . I sometimes hyperventilate. . . . [The attacks happen] [o]nce a week, maybe twice. . . . One [attack] lasted two days, [and some are gone] within 30 minutes to an hour." R. Vol. 2 at 879-81. To establish the impairment of panic attacks, however, Ms. Crane was required to provide "medical evidence consisting of signs, symptoms, and laboratory findings, not only . . . [her] statement of symptoms." 20 C.F.R. §§ 404.1508 and 416.908.

B.

"At step three, the ALJ considers whether a claimant's medically severe impairments are equivalent to a condition listed in the appendix of the relevant disability regulation." *Wall*, 561 F.3d at 1052 (internal quotation marks omitted). *See also* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii). Ms. Crane contends that the ALJ erred at this step when he failed to "consider whether [her] impairments were equivalent to [Listing 12.05C]" for mental retardation. Aplt. Opening Br. at 14. "In order to satisfy listing 12.05, a claimant must meet the requirements of that listing's capsule definition as well as one of the four severity prongs for mental retardation as listed in the regulations." *Wall*, 561 F.3d at 1062

(internal quotations marks and alterations omitted). "The capsule definition for listing 12.05 states: 'Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.'" *Id*., quoting 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1. Severity prong (C) of Listing 12.05, requires a showing of: "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function." *Wall*, 561 F.3d at 1062 (internal quotation marks omitted).

With respect to Listing 12.05(C), the Social Security Administration's Program Operations Manual System (POMS) provides:

> [S]lightly higher IQ's (e.g., 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

POMS No. DI 24515.056(D)(1)(c). This evaluation tool, however, is used only when "the capsule definition of that impairment is satisfied." *Id*. DI 24515.056(B)(1).

There was no evidence that Ms. Crane met the capsule definition for Listing 12.05, which requires evidence "that a claimant exhibit subaverage

-10-

general intellectual functioning before the age of twenty-two." *Wall*, 561 F.3d at 1062. Her lawyer never mentioned mental retardation, focusing instead on her anxiety and panic attacks. Moreover, given that Ms. Crane had a GED and a steady work history, which included jobs at the semi-skilled and skilled levels, the ALJ understandably did not discuss this Listing.

What the evidence demonstrated and the ALJ found was that although Ms. Crane appeared to have a learning disorder and dysthymia, her daily "activities . . . are not significantly limited due to a mental impairment." R. Vol. 2 at 36. He noted the results of an IQ test administered on November 22, 2004, in which Ms. Crane obtained a verbal IQ score of 74, a performance IQ of 95, and a full scale IQ of 82; and he cited the examiner's findings and opinion that Ms. Crane "could remember work location and procedures, understand and follow simple directions, . . . and . . . had adequate attention, concentration and short-term memory for simple tasks. It is substantiated that she functions well at her job as a motel housekeeper." *Id.* These findings are supported by substantial evidence.

C.

Ms. Crane claims that the ALJ improperly assessed her credibility when he found that although her "medically determinable impairments could reasonably be expected to produce the alleged symptoms, . . . [her] statements concerning the intensity, duration and limiting effects of these symptoms are not entirely

credible." *Id*. at 35. The framework for evaluating the intensity and persistence of symptoms and their functional effects is provided in 20 C.F.R. §§ 404.1529(c) and 416.929(c). *See also* SSR 96-7P, 1996 WL 374186, at *1 ("When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects"). "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation marks omitted). "[F]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id*. (internal quotation marks omitted). To be sure, an ALJ is required to do more than simply "recite[] the general factors he considered . . . [without] refer[ring] to any specific evidence." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). But "our opinion in *Kepler* does not require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied." *Id*.

The ALJ's analysis meets this test.  He spent more than two pages discussing factors such as Ms. Crane's daily activities, her delay in seeking mental health treatment, her work and physical activities, and the improvements following her back surgery.  The ALJ's credibility findings are closely and affirmatively linked to substantial evidence and may not be disturbed.

The judgment of the district court is AFFIRMED.

Entered for the Court

Harris L Hartz
Circuit Judge