**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 23, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

GINA L. MCDONALD,

Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

Defendant-Appellee.

No. 11-1263
(D.C. No. 1:10-CV-00871-CMA)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Judge, **McKAY** and **LUCERO**, Circuit Judges.

Gina L. McDonald appeals from a district court order affirming the

Commissioner's denial of her applications for Social Security disability (SSD)

benefits and Supplemental Security Income (SSI) payments under Titles II and XVI

of the Social Security Act.  Exercising jurisdiction under 28 U.S.C. § 1291 and

42 U.S.C. § 405(g), we affirm.

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. Background

McDonald is a high school graduate with two years of college classes and previous work as an order taker, sales-route driver, and peer specialist. She claimed disability beginning on October 3, 2006, due to mental functional limitations. She began therapy on that date at Spanish Peaks Mental Health Center (Spanish Peaks), where she saw various clinicians including Marge Montoya, a nurse practitioner who prescribed her medications. McDonald filed her SSD and SSI applications on October 31, 2006.

### A. Hearing Testimony

At a hearing before an administrative law judge (ALJ) on December 4, 2008, McDonald testified that she has difficulty talking to and socializing with people, and she gets extremely anxious in large groups of people. She said she has crying spells five or six times in a six-month period and panic attacks four to five times per week. She also testified about a recent flare up in her depression. McDonald described her emotional state as being like a roller coaster, with her moods changing from day to day and sometimes from minute to minute. On a scale of one to ten—with ten being the worst—she rated the severity of her mental symptoms on her good days as five and on her bad days as nine. McDonald said she has fifteen to twenty bad days per month. On those bad days, she testified that she stays in bed all day, getting up only to make dinner for her family. On other days she said she needs medication to go to sleep even when she feels tired. McDonald did not believe that, on a bad day, she

- 2 -

would be able to perform a job with very simplistic, routine tasks that did not require her to work with other people.

McDonald testified that she had changed medications fairly regularly due to side effects or lack of effectiveness, but that her medications had been stable for about six months. She stated that her medications made her feel foggy, and that sometimes she knows what she wants to say but cannot think of the words.

McDonald indicated that, in her job as a part-time Peer Specialist at Spanish Peaks in 2008, she led various therapy groups. She said that she quit that job because she was having problems with her home life and was feeling very symptomatic and overwhelmed. Her problems at home related to her disobedient teenage daughter, and McDonald acknowledged that, because her daughter had subsequently moved out, that source of stress was gone.

**B.     ALJ's Decision**

The ALJ issued a decision concluding that McDonald was not disabled. After initially finding that she had the severe impairments of dysthymia (i.e., depression) and post-traumatic-stress disorder, the ALJ stated that these impairments did not meet or medically equal the disabling impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A, §§ 12.04 and 12.06 (Listing of Impairments). In reaching that determination, the ALJ noted that he considered, but rejected, both a state agency psychiatrist's opinion, which found that McDonald has no severe impairments, and an opinion submitted by Montoya and Dr. W. Lee McNabb, a

psychiatrist at Spanish Peaks (McNabb-Montoya opinion). The McNabb-Montoya

opinion concluded that McDonald has marked restrictions in almost all facets of

understanding, memory, sustained concentration, persistence, social interaction, and

adaptation.

The ALJ proceeded to assess the severity of McDonald's functional limitations

under the "B" criteria of the Listing of Impairments based on the other evidence in

the record. He found that McDonald had a mild restriction in her activities of daily

living; mild to moderate difficulty in maintaining social functioning; and moderate

difficulty in maintaining concentration, persistence, or pace.[1] The ALJ found no

evidence of episodes of decompensation of extended duration. The ALJ then based

his assessment of McDonald's residual function capacity (RFC) on his "B" criteria

findings, concluding that she has the RFC

> to perform a full range of work at all exertional levels but with the
> following nonexertional limitations: a restriction to no more than
> semi-skilled work, subject to moderate limitations in the ability to
> maintain attention and concentration for extended periods; moderate
> limitations in the ability to perform activities within a schedule,
> maintain regular attendance, and be punctual within customary
> tolerances; and moderate limitations in the ability to respond
> appropriately to changes in the work settings.

Admin. R. at 18. The ALJ related McDonald's moderate limitations in the area of

attention and concentration to her complaints of difficulty with medication side

---

[1]     The regulations require the ALJ to rate the degree of functional limitations in
these three areas on a five-point scale of none, mild, moderate, marked, or extreme.
*See* 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4).

effects. He tied her moderate difficulties with keeping to a schedule, maintaining attendance and punctuality to her depression. And he related her moderate limitations regarding responding to changes in work settings to her anxiety.

The ALJ next summarized McDonald's hearing testimony. Then, in support of his RFC and credibility findings, the ALJ compared her testimony to the other evidence in the record, both medical and non-medical. He characterized McDonald's family situation as chaotic, primarily due to problems with her older daughter who has legal issues, had run away from home, and was periodically placed outside McDonald's home. The ALJ observed that the vast majority of her counseling sessions focused on her family problems and coping strategies for that stressor, rather than the symptoms she described at the hearing. The ALJ noted that McDonald had initially reported symptoms including panic episodes and difficulty sleeping. But only a month later, McDonald and Montoya agreed that her symptoms had improved on a new medication. In early 2007, McDonald reported worsening depression after she stopped taking medication, but in February and March of that year she denied significant depression. The ALJ observed that, after 2006, she did not report further panic episodes, fear of crowds, or vegetative symptoms. And she began attending seven different therapy groups and going on group social outings.

The ALJ also felt that McDonald had downplayed in her testimony her efforts to find employment. He observed that her barriers to employment reflected in the

record had little to do with her mental status.[2]  By 2008, McDonald was working part-time as a paid Peer Specialist, a role in which she led therapy groups and assisted other clients in determining recovery goals and using problem-solving techniques.  The ALJ noted McDonald's explanation that she did not return to work after September 2008 because she had overwhelming problems in her home life.  The ALJ concluded the evidence showed that both McDonald and her clinicians thought she was capable of working or attending school to complete her college degree, activities which were "indicative of a far greater capacity for focus, social interaction, adaptation, and persistence than her testimony would indicate."  Admin. R. at  21.

Considering also the observations of her treating clinicians, the ALJ found no objective support for McDonald's contentions of extreme limitations, as described in her testimony.  The ALJ observed that during her psychological assessment on October 3, 2006, her performance on a mental status exam was patchy, but the clinician rated her Global Assessment of Functioning (GAF) as 52, within the

---

[2]  While noting that McDonald had reported she was anxious about seeking work, the ALJ cited her difficulty explaining her lapse in work history; her difficulty effectively communicating her need for time off for court hearings and appointments; her criminal history; her hesitation to look for work in 2006 because she was busy moving; and her need to get her student loans out of default before continuing her education, as reasons reflected in the record why she did not follow through with employment or schooling.

moderate range.[3]  A few days later, Montoya assessed McDonald's GAF as 60, at the

high end of the moderate range.  The ALJ found that McDonald's treatment records,

over all, consistently indicated that she was cooperative and able to communicate

without difficulty; her speech was appropriate and her thought processes were

organized, clear, and coherent; her grooming and dress were appropriate; and her

mood and affect were stable, calm, and within the normal range.  The ALJ noted

exceptions when McDonald failed to take her medications as prescribed.  The ALJ

stated that the evidence, objective and otherwise, did not support McDonald's

contentions regarding the severity or chronicity of her symptoms.  He concluded that

"her statements concerning the intensity, persistence and limiting effects of [her]

symptoms are not credible to the extent they are inconsistent with the residual

functional capacity assessment."  Admin. R. at 21.

The ALJ also explained his rejection of the McNabb-Montoya opinion, stating

first that it was not entitled to controlling weight because there was no indication in

the record that Dr. McNabb ever treated McDonald.[4]  The ALJ further found that the

---

[3]     The GAF is a subjective rating of "the clinician's judgment of the individual's overall level of functioning," based on a scale of 1-100, with 100 being the highest level of functioning.  Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (Text Rev. 4th ed. 2000) at 32.  A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)" or "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

[4]     Montoya, a nurse practitioner, is not an "acceptable medical source." *See* 20 C.F.R. §§ 404.1513(a), (d)(1), 416.913(a), (d)(1).  She therefore would not qualify

(continued)

actual observations of McDonald's treating clinicians, including Montoya, failed to support the conclusions in the McNabb-Montoya opinion that McDonald has the marked limitations shown and could not sustain a normal workday or workweek.

Citing hearing testimony from a vocational expert, the ALJ ultimately concluded that, with her RFC, McDonald was capable of performing her past relevant work as a sales-route driver and order taker. Therefore, the ALJ concluded she was not under a disability from October 3, 2006, through the date of the decision.

After the Appeals Council denied her request for review, McDonald filed an appeal of the Commissioner's decision in the district court. That court affirmed the denial of her claims, and McDonald filed a timely appeal.

## II. Discussion

"We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

> Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance. We consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but we will not reweigh the evidence or substitute our judgment for the Commissioner's.

as a "treating source" whose opinion could be entitled to controlling weight. *See Bowman v. Astrue*, 511 F.3d 1270, 1275 n.2 (10th Cir. 2008) (quotations omitted).

- 8 -

*Cowan v. Astrue*, 552 F.3d 1182, 1185 (10th Cir. 2008) (quotation omitted).

McDonald asserts on appeal that (1) the ALJ did not properly weigh the McNabb-Montoya opinion; (2) the ALJ failed to properly assess her credibility; and (3) the ALJ's RFC finding is not supported by substantial evidence because the ALJ did not rely on a medical opinion to determine her mental functional limitations.

## A. ALJ's Rejection of McNabb-Montoya Opinion

"[T]he opinion of a treating physician concerning the nature and extent of a claimant's disability is entitled to controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the claimant's case record." *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (quotations and brackets omitted). "The treating physician's opinion is given particular weight because of his unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . . This requires a relationship of both duration and frequency." *Id.* (quotation omitted). Further, "a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits." *Id.* at 762-63. If a physician is not a "treating physician" within the meaning of the regulations, his opinion is not entitled to a presumption of controlling weight. *Id.* at 762.

The McNabb-Montoya opinion is a check-the-box Mental Work Capacity Evaluation form completed by Dr. McNabb and Montoya on November 20, 2008. In

it they stated that they had treated McDonald since October 5, 2006. They responded "yes" to the question whether McDonald's condition was serious enough that she would have a pattern of missing four or more days of work per month if she were working full-time. They also answered "yes" to the question whether McDonald would be so preoccupied with her condition that she would lose one hour or more of productivity per day at any job. Admin. R. at 323.

The form asked for an opinion on the degree of McDonald's limitations in various functional areas—either none, slight, moderate, marked, or extreme—resulting from her mental difficulties. It defined "marked" as "[s]erious limitations in this area. The ability to function in this area is severely limited but not precluded." *Id.* at 324. "Moderate" was defined as "[m]oderate limitations in this area, but still able to function." *Id.* And "slight" meant "[s]ome mild limitation in this area, but generally functions well." *Id.* Dr. McNabb and Montoya opined that McDonald has marked limitations in all of the following functional areas:

- remembering locations and work-like procedures;
- understanding and remembering very short and simple instructions;
- maintaining attention and concentration for extended periods;
- performing activities on a schedule, regular attendance, and punctuality;
- working in coordination with or in proximity to others without being distracted by them;
- making simple work-related decisions;
- interacting appropriately with the general public;
- accepting instructions and responding appropriately to criticism from supervisors;
- getting along with coworkers without distracting them or exhibiting behavioral extremes;
- maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness;

- responding appropriately to changes in the work setting;
- traveling in unfamiliar places or using public transportation; and
- setting realistic goals and making plans independently of others.

They further concluded that McDonald has moderate limitations in carrying out very short and simple instructions; slight limitations in asking simple questions and requesting assistance; and slight limitations in being aware of normal hazards and taking appropriate precautions. Dr. McNabb and Montoya did not reference any of McDonald's medical records in support of their opinion.

### 1. ALJ's Determination that Dr. McNabb Was Not McDonald's Treating Physician

In her opening brief, McDonald challenges the ALJ's determination that Dr. McNabb was not her treating physician based on there being no indication in the record that he ever treated her. She contends that Dr. McNabb qualified as her treating physician because he "evaluated" her. But in her reply brief she appears to acknowledge that Dr. McNabb does not meet the regulatory definition of a treating source, which requires "an ongoing treatment relationship":

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

20 C.F.R. §§ 404.1502, 416.902.

McDonald does not claim that she ever saw Dr. McNabb.  The earliest record mentioning him is a letter to the Social Security Administration, in response to a request for a diagnosis of McDonald by an acceptable medical source, for purposes of her Social Security applications.  In that letter, Dr. McNabb recited *Montoya's* diagnoses of McDonald.  *See* Admin. R. at 207.  Two other treatment notes reflect that Montoya had two clinical consultations with Dr. McNabb over the course of two years, in March 2007 and May 2007, to review McDonald's psychological evaluation, psychological and medical history, diagnosis, symptoms, treatment, prescriptions, and current progress.  Each note reflects that Dr. McNabb supported the current plan of care, diagnosis, and prescriptions.  And as McDonald contends, one note could be interpreted as reflecting Dr. McNabb's direction to increase her dosage of a particular medication.  *See id.* at 243-44, 254.  McDonald asserts that Dr. McNabb was otherwise "supervising" her ongoing care by her clinicians, but there is no evidence of that.

On this record, the ALJ did not err in finding Dr. McNabb was not McDonald's treating source.  In *Doyal*, 331 F.3d at 764, we held that a doctor who saw the claimant only twice in seven years and who completed a report solely to support the claimant's disability claim was not a treating source.  Dr. McNabb *never* examined McDonald; his letter to the SSA served no purpose other than to support her disability claims; and his two consultations with Montoya were insufficient to give him "a deeper insight into [McDonald's] medical condition" than "a person who

- 12 -

has examined a claimant but once, or who has only seen the claimant's medical records." *id.* at 762 (quotation omitted). Thus, the record fails to establish that Dr. McNabb had a relationship with McDonald "of both duration and frequency," *id.*, such that he qualifies as her treating source. C*f. Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (holding claimant's contacts with two doctors "fail to evince the type of ongoing treatment relationship contemplated by the plain text of the regulation," where one doctor examined claimant once and prepared an evaluation, and a second doctor examined claimant once, completed a medical report, prescribed and refilled medication, then denied an additional request for medication).[5]

### 2. ALJ's Weighing of McNabb-Montoya Opinion

McDonald asserts that if Dr. McNabb was not her treating source, his opinion should nonetheless have been weighed as that of a nonexamining physician. She claims that the ALJ therefore erred by ending his inquiry with a finding that Dr. McNabb never treated McDonald. Yet, as McDonald recognizes, the ALJ did not end his inquiry with that finding. The ALJ further concluded that, in comparing the

---

[5]     McDonald contends that the definition of a treating source is too inflexible in this age of managed care, when much of the hands-on treatment is performed by non-physicians. For this proposition she cites Social Security Ruling (SSR) 06-03p, 2006 WL 2329939 (Aug. 9, 2006), which describes the increasing assumption by nurse practitioners, physician assistants, and licensed clinical social workers of the treatment functions previously handled by physicians and psychologists. *Id.* at *3. But SSR 06-03p reiterates the continuing need for the distinction between "acceptable medical sources" and other medical sources, as well as the definition of a "treating source." *Id.* at *2.

actual observations of McDonald's clinicians, including Montoya herself, with the conclusions in the McNabb-Montoya opinion, he could "find no support for the severity of their conclusions and afford[ed] them no weight." Admin. R. at 22.

Supportability—the extent to which a medical source presents relevant evidence to support an opinion—and consistency with the record are two of the factors relevant to the weight that an ALJ gives to a medical opinion from any source. *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4). Moreover, under the regulations, "because nonexamining sources have no examining or treating relationship with you, the weight [the agency] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." *Id.* §§ 404.1527(c)(3), 416.927(c)(3). And "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight [the agency] will give to that opinion." *Id.* §§ 404.1527(c)(4), 416.927(c)(4). Opinions from non-physicians, like Montoya, should likewise be weighed by the ALJ according to the same factors applicable to opinions from acceptable medical sources. *See Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007).

McDonald argues that the ALJ improperly picked and chose the portions of her treatment records that were consistent with his rejection of the McNabb-Montoya opinion and ignored other evidence supporting their conclusions. She points to 5 out of a total of more than 150 pages of records that she claims the ALJ ignored. All of these records relate to McDonald's initial days of treatment at Spanish Peaks,

- 14 -

including her intake assessment on October 3, 2006, and her first appointment with Montoya two days later.

"The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). Here the ALJ stated that he carefully considered all of the evidence. *See Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) (noting well-established principle of taking ALJ at his word when he indicates he considered all of the evidence). Moreover, the ALJ did not ignore the record of McDonald's October 3, 2006, intake assessment or the treatment notes from her visit with Montoya two days later: he referenced the former at several different points in the decision and the latter at least once. While the ALJ did not explicitly discuss every aspect of these records, he did mention McDonald's endorsement of panic symptoms, her sleep difficulties, and her patchy performance on a mental status exam on October 3, before observing that, according to Montoya, McDonald's depression and anxiety had improved only a month later. The ALJ also noted McDonald's reports elsewhere in the record regarding her need for reminders to take care of her personal needs and grooming; her fatigue; her impulsive behaviors; her need to shop at times of the day when she could avoid crowds; and the fact that her part-time job in 2008 was short-lived. But the ALJ determined that the medical records as a whole—including Montoya's own treatment notes—did not support the conclusions in the McNabb-Montoya opinion that McDonald had *marked* restrictions in *nearly all*

*areas* of understanding, memory, concentration, persistence, social interaction, and adaptation. *See Doyal*, 331 F.3d at 764 (rejecting medical opinion as inconsistent with evidence as a whole, after concluding doctor was not claimant's treating physician). McDonald has not shown that the ALJ failed to consider all of the evidence in the record. *See Clifton*, 79 F.3d at 1009.

McDonald next contends that the ALJ erred in relying on her moderate-range GAF scores. McDonald initially challenges these assessments as being made by "untrained persons." Aplt. Opening Br. at 23. But the record indicates that Montoya, a nurse practitioner, assigned McDonald the GAF score of 60 on October 5, 2006,[6] and McDonald provides no information regarding the "untrained" status of the other clinician who assessed her GAF as 52 two days earlier. McDonald also argues that a moderate GAF score does not mean that a person has no marked mental impairments in any areas of mental functioning. But the ALJ did not reject the McNabb-Montoya opinion based solely on her GAF scores; he merely considered those scores as part of the evidence relevant to weighing that opinion.

Finally, McDonald asserts that the ALJ failed to weigh the opinions of the clinicians who treated her at Spanish Peaks according to the factors in 20 C.F.R.

---

[6] The treatment notes indicating a GAF score of 60 were transcribed and electronically signed by an employee identified as "support staff" at Spanish Peaks, but they were approved by Montoya. Admin. R. at 193-94. Several of the subsequent treatment notes from McDonald's medication-management visits with Montoya were similarly entered into the Spanish Peaks records system in this manner.

§§ 404.1527(c) and 416.927(c). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). As we have noted, the factors for weighing opinions from acceptable medical sources also apply to opinions from medical sources who are not acceptable medical sources, which includes the clinicians who treated McDonald at Spanish Peaks *See Frantz*, 509 F.3d at 1302.

McDonald argues the treatment notes containing her two GAF scores are medical opinions that the ALJ failed to weigh.[7] As noted, the first of these records relates to McDonald's intake assessment at Spanish Peaks. These notes reflect the symptoms she reported, her coping strategies, her current medications, lethality and substance-abuse assessments, a list of McDonald's strengths, the results of a mental status exam, diagnostic impressions and diagnoses (including the GAF score of 52), and recommendations as to services McDonald needed. *See* Admin R. at 177-85. The other record relates to her first appointment with Montoya, and these notes reflect McDonald's request for new medication, her reports of her symptoms, her psychiatric, medical, and substance-abuse history, her education and current living

---

[7] Other than the records containing her GAF scores, McDonald does not point to any particular treatment note or set of notes that she claims would qualify as a medical or other opinion.

- 17 -

situation, the results of a mental status exam, Montoya's diagnoses (including the GAF score of 60), and a treatment plan. *See id.* at 190-94.

The treatment notes cited by McDonald do not qualify as medical opinions. These records reflect the clinicians' observations of her symptoms, the nature of her impairments, and the clinicians' diagnoses, and the GAF scores addressed in general terms the severity of her symptoms and functional difficulties. But these notes do not indicate any prognoses, nor do they provide opinions as to what McDonald could still do despite her impairments or the nature of her mental restrictions. *See Cowan*, 552 F.3d at 1189 (finding doctor's statement providing no information about the nature and severity of the claimant's physical limitations or the activities he could still perform was not a medical opinion). McDonald has not shown that the ALJ erred in rejecting the McNabb-Montoya opinion as inconsistent with the other evidence in the record.

## B. ALJ's Assessment of McDonald's Credibility

The ALJ related McDonald's hearing testimony, which he characterized as describing extreme limitations. He then summarized the other evidence in the record, observing in detail where her testimony conflicted with it. The ALJ also specifically found there was no objective support for McDonald's extreme contentions based on the observations of her treating clinicians. He concluded that McDonald's "statements concerning the intensity, persistence and limiting effects of [her]

- 18 -

symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." Admin. R. at 21.

Citing *McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002), McDonald argues that the ALJ's assessment of her credibility was nothing more than a bare conclusion. She suggests that the ALJ first created an RFC, then simply rejected her testimony to the extent it indicated more severe restrictions. In *McGoffin*, the ALJ found that the claimant's testimony was not credible to the extent it conflicted with his conclusion that her mental illness alone was not disabling. *Id.* There is no indication in *McGoffin* that the ALJ's decision said anything more with respect to a credibility assessment. We held that the ALJ failed to "explain and support with substantial evidence which [parts] of [the claimant's] testimony he did not believe and why." *Id.* McDonald argues that the ALJ here reached a similar boilerplate conclusion that he failed to link to the evidence. We disagree. The ALJ related McDonald's testimony, then carefully reviewed the other evidence, noting specific discrepancies, before concluding that her testimony was not fully credible. Nor is it impossible, as McDonald contends, to know what portions of her testimony were or were not credible. It is clear that the ALJ found incredible McDonald's claims of having more than the moderate limitations provided in her RFC.

McDonald also contends that the ALJ applied the wrong legal standard by finding her testimony only partially credible based on a lack of objective evidence supporting her claims. *See Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004)

(holding lack of confirming objective medical tests was not alone sufficient to reject statements about intensity and persistence of symptoms). But here the ALJ considered other relevant evidence along with the objective medical evidence, including McDonald's own reports of her symptoms to her treating sources. McDonald has not shown error in the ALJ's assessment of her credibility.

**C.     Whether the ALJ's RFC Determination is Supported by Substantial Evidence**

McDonald contends that the ALJ's RFC finding is not supported by *any* evidence because he rejected all of the medical opinions on the severity of her impairments and her functional limitations. She maintains that a mental RFC is essentially a medical determination outside of the ALJ's expertise, asserting that "[t]he ALJ is not able to determine from his own review of statements in the medical record, or the claimant's daily activities, whether a specific mental impairment even exists, much less whether it is moderate or marked in severity." Aplt. Opening Br. at 30. In particular, McDonald argues that an ALJ is not capable of determining, without a corresponding medical opinion, a person's mental capacity to perform in a fulltime work setting. By doing so, McDonald claims, the ALJ improperly substituted his own lay opinion for that of the medical experts.

McDonald's "contention rests on an unduly narrow view of the role of the administrative factfinder in social security disability proceedings." *Chapo v. Astrue*, ___ F.3d ___, No. 11-1455, 2012 WL 2384354, at *2 (10th Cir. June 26, 2012). In *Chapo*, we rejected the argument that the limitations in an ALJ's mental RFC

assessment must always be supported by a specific medical opinion, noting that

"there is no requirement in the regulations for a direct correspondence between an

RFC finding and a specific medical opinion on the functional capacity in question."

*Id.* To the contrary, "the ALJ, not a physician, is charged with determining a

claimant's RFC from the medical record." *Id.* (quotation and alteration omitted); *see*

*also* 20 C.F.R. §§ 404.1546(c), 416.946(c) (providing ALJ is responsible for

assessing RFC). And the ALJ's RFC assessment is an administrative, rather than a

medical, determination. *See* Social Security Ruling (SSR) 96-5p, 1996 WL 374183,

at *5 (July 1996) ("The term '*residual functional capacity assessment*' describes an

adjudicator's finding about the ability of an individual to perform work-related

activities. The assessment is based upon consideration of all relevant evidence in the

case record . . . . [A] medical source statement must not be equated with the

administrative finding known as the RFC assessment.").

Thus, we reject McDonald's contention that an ALJ is not competent, in the

absence of a medical opinion, to assess the severity of mental symptoms and

determine the extent of the limitations that result based on the evidence in the

claimant's medical records, her daily activities, and her positive response to

medications. That is precisely the type of evidence an ALJ should consider in

determining a claimant's RFC. An ALJ makes that assessment based on *all* the

evidence in the case record, both medical and non-medical. *See* 20 C.F.R.

§§ 404.1545(a)(1), (3), 416.945(a)(1), (3); *see also* SSR 96-8p, 1996 WL 347184, at

- 21 -

*5 (1996) (listing types of relevant evidence ALJ should consider); 20 C.F.R. §§ 404.1520a(b)-(d), (e)(4), 416.920a(b)-(d), (e)(4) (describing administrative process for evaluating degree of functional limitations and severity of mental impairments and providing that the ALJ's written decision must include these determinations).

The Commissioner contends that, on the record in this case, substantial evidence supports the ALJ's decision that McDonald has moderate—rather than marked—functional limitations, even in the absence of a corresponding medical opinion. He notes that the ALJ cited McDonald's consistent interest in and efforts to obtain work or finish her college degree; her clinicians' endorsement of her work/educational efforts; the fact that her reasons for not working or attending school were largely unrelated to her mental status; her engagement in a wide range of daily activities, which was at odds with her claim that she was essentially bedridden most of the time and isolated from other people; the relatively unremarkable medical findings; and the evidence that her treatment was effective in controlling her symptoms.

To the extent McDonald responds to the Commissioner's contention, her argument is not well-developed. She describes the ALJ's RFC determination as based on purely speculative inferences, and she argues that it cannot be explained by her "ability to attend classes and pursue work activity, [her] good response to medication, or any number of positive mental signs." *Id*. at 5-6. She baldly asserts

that "[t]hese specific mental limitations and their causes are simply not supported by any evidence in the record." *Id.* at 6. But McDonald fails to discuss all of the specific evidence that the ALJ relied upon.[8] And her assertions all ultimately circle back to her overarching contention that an ALJ is categorically unqualified to reach a mental RFC determination without the benefit of a medical opinion.[9]

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cowan*, 552 F.3d at 1185 (10th Cir. 2008) (quotation omitted). "[W]e will not reweigh the evidence or substitute our judgment for the Commissioner's." *Id.* (quotation omitted). And "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Id.* (quotation omitted). We agree with the Commissioner that the ALJ's RFC finding including only moderate limitations was consistent with the longitudinal picture portrayed by the record as a whole and was supported by substantial evidence.

---

[8] McDonald argues (again) that the ALJ improperly picked and chose only the findings in her treatment records that sounded most normal, while ignoring other findings that could support disability. We have already rejected that contention. *See supra* pp. 14-16.

[9] McDonald also asserts that the ALJ erred in finding that she has no limitations in the other areas of mental functioning noted in the McNabb-Montoya opinion. But she wholly fails to support that contention. She does not describe any of these other functional areas or demonstrate why the ALJ's determination was not supported by substantial evidence.

## III.    Conclusion

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Chief Judge