NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 30, 2013
Decided February 14, 2013

**Before**

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

No. 12-2730

| | |
|---|---|
| ROBERT J. CHARETTE, JR., <br> *Plaintiff-Appellant*, | Appeal from the United States District <br> Court for the Western District of Wisconsin. |
| *v.* | No. 11-CV-00819 |
| MICHAEL J. ASTRUE, <br> Commissioner of Social Security, <br> *Defendant-Appellee*. | Barbara B. Crabb, <br> *Judge*. |

## O R D E R

Robert Charette was denied disability insurance benefits and supplemental security income, after claiming that his borderline intellectual functioning and learning disability left him incapable of gainful employment. Because the administrative law judge's analysis supports the finding that Charette does not suffer "deficits in adaptive functioning" and therefore does not meet the listing criteria for mental retardation, we affirm.

At the age of 39, Charette applied for DIB and SSI, claiming that his learning disability and illiteracy rendered him unable to work. He completed high school (in special education classes), but cannot read newspapers or street signs and has trouble remembering tasks and understanding instructions. He can read "a little kid book" and words like "cheeseburger" and "fries" on a menu. His math skills are limited to basic arithmetic—addition, subtraction, multiplication, and division of small numbers. Despite his limitations, he was able to obtain his driver's license at age 18 (the test questions were read aloud to him), and he can drive around his small town.

Since 1993 Charette has worked as a groundskeeper, dishwasher, and car washer, as well as a full-time assistant performing simple tasks for roofers, iron workers, and masons. He obtained his construction jobs by working for family and neighbors. But Charette has been unemployed since he stopped working in 2007 and has trouble keeping jobs for more than a year. He explained that he had difficulty retaining jobs that require changes in his daily duties; he stopped working at construction sites after he was unable to pass the written apprenticeship tests, and he lost his dishwasher job because his employer wanted him to also cook, which required reading recipes and written orders.

Charette lives on a tribal reservation with his girlfriend and his three dogs. He takes care of household chores, such as laundry, snow shoveling, cutting firewood, grocery shopping, and lawn mowing. He lived with his mother before she moved to a nursing home. He relies on his mother to remind him of appointments and on his girlfriend to help him prepare meals. His neighbor previously helped him read bills and fill out paperwork, but after she moved, Charette lost his food stamps benefits because he was unable to read the notice telling him to set up an appointment for recertification.

In connection with Charette's application for benefits, Marcus Desmonde, a psychologist, administered an IQ test and diagnosed Charette with borderline intellectual functioning and a learning disorder. IQ scores are scaled so that approximately 95% of the population falls between 70 and 130, with a mean of 100. *See* American Psychological Association Task Force, *Intelligence: Knowns and Unknowns*, 51(2) AMERICAN PSYCHOLOGIST 77, 78 (1996). Charette's composite IQ score was 67 (with a 95% confidence interval of 64 to 72). Desmonde described the score as consistent with Charette's educational background but lower than expected given his work history. An agency doctor, Eric Edelman, reviewed the record and conducted a "mental residual functional capacity assessment," concluding that Charette was "not significantly limited" in 18 of the 20 areas assessed. He determined that Charette was capable of unskilled work, despite his mild restrictions in daily living and social functioning and his moderate difficulties maintaining concentration. An agency psychologist reviewed the medical record and agreed with Edelman's assessment.

At a hearing before the ALJ, a vocational expert testified that Charette's previous jobs included unskilled and semi-skilled work, with exertion levels ranging from medium to very heavy. He explained that a person limited to simple, routine tasks would be qualified to perform unskilled work as a hand or machine packer and that there were 9,000 such jobs in Wisconsin and 50,000 nationally.

The ALJ concluded that Charette was not disabled within the meaning of the Social Security Act. Following the required five-step analysis, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), the ALJ determined that Charette had not worked since his alleged onset date (step one); his borderline intellectual functioning and learning disability were severe impairments (step two); these impairments did not meet or equal the listed impairment for mental retardation (step three); he had a residual functional capacity to perform unskilled work involving simple and routine tasks, though he could no longer perform his past semi-skilled work (step four); and, based on the vocational expert's testimony, there were jobs that Charette could perform (step five).

Of significance for this appeal, the ALJ found that Charette did not meet the criteria for mental retardation under Listing 12.05(C), which requires a claimant to show (1) "deficits in adaptive functioning" before age 22, (2) a valid IQ score of 60 through 70, and (3) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05(C). The ALJ determined that Charette's adaptive functioning was good because he had no problems with daily living or social functioning. She also found that Charette lacked a valid IQ score in the relevant 60 to 70 range by adopting Dr. Desmonde's position. He concluded that the composite score of 67 was inconsistent with Charette's extensive work history and thus presumably understated his mental capabilities. After the Appeals Council denied review, the district court upheld the decision because the ALJ sufficiently explained why Charette's daily activities demonstrated that he did not suffer from "deficits in adaptive functioning."

On appeal, Charette argues that the ALJ failed to sufficiently explain her reasoning because she did not apply a measurement tool for "deficits in adaptive functioning" issued by a professional organization that deals with mental retardation. As an example, Charette points to the American Psychiatric Association's definition of "deficits in adaptive functioning," which requires deficits in two skill areas out of a list of ten generic skills (including communication, self care, and social skills), and argues that the evidence in his case compellingly shows that he meets that definition.

But when we earlier defined deficits in adaptive functioning as the "inability to cope with the challenges of ordinary everyday life" we did not also require an ALJ to use a specific measurement method. *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) (citing American

Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 42 (4th ed. 2000)). As Charette acknowledges, neither this circuit nor any other circuit court has recognized or established such a requirement.[1] Furthermore, the agency itself has stated that use of these measurement tools is optional. *See* Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018, 20022 (Apr. 24, 2002) ("SSA's definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations."). Because the ALJ examined Charette's ability to cope with the challenges of daily life, she applied the correct legal standard. *See Novy*, 497 F.3d at 710.

Charette next argues that the ALJ lacked substantial evidence for her finding and points to significant evidence that he faces substantial limitations in daily living. But the ALJ identified the limitations Charette faces, such as difficulty remembering tasks and reading, and then discussed how he overcomes them well enough to live independently, manage household chores, take care of his pets, and socialize with other people. Substantial evidence in the record supports the conclusion that Charette has been able to cope with the difficulties of daily life despite his intellectual limitations, *see Novy*, 497 F.3d at 710; *Hancock v. Astrue*, 667 F.3d 470, 475–76 (4th Cir. 2012). The ALJ properly evaluated both Charette's limitations and his adaptive ability to overcome them, including his ability to reach out to friends and neighbors for help. Because substantial evidence supports the ALJ's finding that Charette lacks "deficits in adaptive functioning"—a prerequisite under Listing 12.05(C), *see Novy*, 497 F.3d at 710—we do not reach Charette's remaining arguments concerning the validity of his IQ score.

**AFFIRMED**.

---

[1] In *Wall v. Astrue*, 561 F.3d 1048, 1074 (10th Cir. 2009), the dissenting judge, while acknowledging that the agency has never adopted a standard, favored remanding and requiring the ALJ to "choose a standard measurement and notify claimant what it is."